UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
CERTAIN UNDERWRITERS at LLOYD'S,
et al.,

                            Plaintiffs,                       **MEMORANDUM**
                                                                **AND ORDER**

        -against-

                                                  **14-CV-4717 (FB)**

NATIONAL RAILROAD PASSENGER
CORPORATION, et al.,

                            Defendants.
-------------------------------------------------------------x

**ROANNE L. MANN, CHIEF UNITED STATES MAGISTRATE JUDGE:**

In this declaratory judgment action, plaintiff-insurers seek, *inter alia*, a determination as to whether a series of liability insurance policies, issued to defendant National Railroad Passenger Corporation ("Amtrak") more than three decades ago, obligates plaintiff-insurers to reimburse Amtrak for costs incurred in connection with environmental waste allegedly found on Amtrak's property. See Amended Complaint (Nov. 11, 2014) ("Am. Compl.") ¶¶ 1-2, Electronic Case Filing Docket Entry ("DE") #111; Amtrak Amended Answer, Counterclaims & Cross-Claims ("Amtrak Am. Ans.") (Dec. 30, 2015), DE #277.

Currently pending before the Court are certain aspects of Amtrak's motion to compel discovery, as well as a motion for a protective order filed by plaintiff-insurers concerning Amtrak's entitlement to production of reinsurance agreements under Rule 26(a)(1)(A)(iv) of the Federal Rules of Civil Procedure ("FRCP").[1] See [Amtrak's] Motion to Compel (Nov.

---

[1] Plaintiffs are collectively referred to in this action and opinion as the London Market Insurers ("LMI"). Notably, not all insurers who participated in the policies at issue are plaintiffs in this action; indeed, some (including several involved in the instant dispute, see

(continued...)

23, 2015) ("Amtrak Mot."), DE #256; [LMI] Motion for Protective Order (Apr. 7, 2016) ("LMI 4/7/16 Mot."), DE #345; see also [First State Insurance Company ("First State")] Letter Motion for Protective Order (Apr. 7, 2016) ("First State Mot."), DE #346. The Court previously ruled on other portions of Amtrak's motion, as well as on a separate motion to compel by plaintiff-insurers. See generally Minute Entry (docketed Feb. 1, 2016) ("2/1/16 Minute Entry"), DE #304; Memorandum and Order (Feb. 19, 2016) ("2/19/16 M&O"), DE #315; Memorandum and Order (April 25, 2016) ("4/25/16 M&O"), DE #376 (denying motion for reconsideration of the 2/19/16 M&O).

For the reasons set forth below, the Court (1) grants in part and denies in part Amtrak's motion to compel; and (2) denies in substantial part the Insurers' motions for a protective order.

## BACKGROUND

Plaintiffs in this action are insurers who "did business in the London Insurance Market and who issued or participated in — that is, subscribed to an agreed percentage share of the risk of —" one or more liability insurance policies issued to Amtrak during the period beginning on or about June 1, 1972 and ending in 1986 (the "Policies"). See Am. Compl. ¶¶ 1-2. According to the Amended Complaint, due to certain environmental contaminations

---

[1](…continued)
infra pp. 11-19) have been named as defendants, see Am. Compl. ¶ 5, and additional insurers have been named as third-party defendants, see generally [Corrected] Third-Party Complaint (Mar. 23, 2016) ("Amtrak Third-Party Compl."), DE #334; see also Am. Compl. ¶ 2; id. Attachment A, DE #111 at 38-40.

For purposes of clarity, because some of the defendant-insurers are the subject of Amtrak's motion to compel and they join in LMI's opposition, the Court, at times, refers to LMI and these defendant-insurers collectively as the "Insurers."

and/or asbestos exposure, Amtrak demanded coverage under the Policies.  See id. ¶¶ 7-8.

Thereafter, the parties entered into a standstill agreement, and, for many years, attempted to

settle the coverage issue in good faith.  See id. ¶¶ 9-11.  In or around 2014, however, Amtrak

notified LMI that it wished to terminate the standstill agreement, and this action followed.

See id. ¶ 11.

## I.    Motions Filed and the 1/29/16 Hearing

On November 23, 2015, the parties filed cross-motions to compel.  See Amtrak Mot.;

[LMI's] Motion to Compel (Nov. 23, 2015), DE #255.  Both sides submitted evidentiary

material in support of their motions, see, e.g., Declaration of Martin Watson, DE #266-3;

Email from Dan Healy (Nov. 17, 2015), DE #256-8, as well as opposition papers, see, e.g.,

[LMI's] Memorandum in Opposition (Dec. 17, 2015) ("LMI 12/17/15 Opp.") at 7, DE #266;

[Amtrak's] Response in Opposition to Motion to Compel (Dec. 17, 2015), DE #267.[2]

In Amtrak's motion, it sought, among other things, to compel production of various

---

[2]  In addition to LMI, a number of defendant-insurers filed their own oppositions.  See [Banco
De Seguros Del Estado ("Banco")] Response to Motion (Dec. 17, 2015), DE #259;
Declaration of Katherine M. Frost (Dec. 17, 2015) ("Frost Decl.") (on behalf of Continental
Insurance Company ("Continental")), DE #261; Declaration of Kristen C. Vine (Dec. 17,
2015) ("Vine Decl.") (on behalf of American Home Assurance Company, Granite State
Insurance Company ("Granite"), Insurance Company of the State of Pennsylvania
("Pennsylvania Insurance Company"), Landmark Insurance Company, Lexington Insurance
Company, National Union Fire Insurance Company of Pittsburgh, PA (hereinafter, the "AIG
Companies")), DE #262; [Yosemite Insurance Company] Response in Opposition (Dec. 17,
2015), DE #263; [Nationwide Mutual Insurance Company ("Nationwide") and Wausau
International Underwriters ("Wausau")] Response in Opposition (Dec. 17, 2015), DE #264;
Declaration of Wm. Gerald McElroy, Jr. (Dec. 17, 2015) ("McElroy Decl."), DE #265;
[Evanston Insurance Company ("Evanston")] Response in Opposition (Dec. 17, 2015), DE
#268.  The documents sought by Amtrak from each insurer are discussed in detail below.  See
infra pp. 11-19.

types of documents in the Insurers' custody, possession, or control, including, but not limited to, settlement communications, underwriting manuals, and communications with regulatory bodies.  See [Amtrak] Memorandum of Law in Support of Its Cross-Motion to Compel (Nov. 23, 2015) ("Amtrak 11/23/15 Mem.") at 5-12, DE #256-1.  Amtrak also challenged certain insurers' claims of work product privilege over material that, according to Amtrak, those insurers created in the ordinary course of business and not in anticipation of litigation.  See id. at 4-5.[3]

On January 29, 2016, the Court heard oral argument on the cross-motions.  See 2/1/16 Minute Entry; Transcript of Civil Hearing (Jan. 29, 2016) ("1/29/16 Tr."), DE #309.  The hearing lasted more than eight hours, see 2/1/16 Minute Entry at 1, and was eventually continued over until February 2, 2016, see Minute Entry (Feb. 2, 2016), DE #306; Transcript of Civil Hearing (Feb. 2, 2016), DE #310.  During the January 29th oral argument, the Court granted in part and denied in part aspects of both motions to compel.  See generally 2/1/16 Minute Entry.  The Court encouraged the parties to meet and confer in an attempt to resolve and/or narrow the remaining discovery disputes.  See id. at 2.

## II.    The Parties' Subsequent Status Reports

Following the issuance of the 2/1/16 Minute Entry, the parties filed a series of status reports addressing their efforts to settle the outstanding disputes.  See Status Report (Feb. 4,

---

[3] In addition, Amtrak argued that certain communications on LMI's and Wausau/Nationwide's privilege logs had been shared with third parties and therefore were not protected by the attorney-client privilege.  See Amtrak 11/23/15 Mem. at 8.  On February 19, 2016, the Court issued an opinion addressing those attorney-client privilege claims, see generally 2/19/16 M&O, and the Court adhered to its rulings on reconsideration, see 4/25/16 M&O.

2016), DE #308; Status Report (Feb. 19, 2016) ("2/19/16 Status Report"), DE #316; Status Report (Mar. 4, 2016) ("3/4/16 Status Report"), DE #321; Status Report (March 24, 2016) ("3/24/16 Status Report"), DE #335; Status Report (Apr. 12, 2016) ("4/12/16 Status Report"), DE #354; <u>see also</u> Order (Feb. 25, 2016), DE #317; Minute Entry (Mar. 17, 2016), DE #331.

In addition, during the pendency of these ongoing discussions, LMI and certain defendant-insurers moved for a protective order that would allow the Insurers to withhold reinsurance agreements from production under Rule 26(a)(1)(A)(iv), <u>see</u> LMI 4/7/16 Mot.; First State Mot., and Amtrak opposed the motions and moved to strike LMI's declarations in support of that motion, <u>see</u> [Amtrak's] Response in Opposition (Apr. 18, 2016) ("Amtrak 4/18/16 Opp."), DE #371; [Amtrak's] Response in Opposition to First State Motion (Apr. 18, 2016) ("Amtrak Opp. to First State"), DE #372; [Amtrak's] Letter Motion to Strike Declarations (Apr. 18, 2016) ("Amtrak 4/18/16 Mot."), DE #373.

The Court will now address all remaining issues in Amtrak's motion to compel, as well as the Insurers' motions for a protective order with respect to reinsurance agreements.[4]

---

[4] With the issuance of this opinion, all requests for relief in LMI's November 23, 2015 motion to compel have now been disposed of, either through Court order or pursuant to informal resolution. LMI's April 4, 2016 motion to compel as against Amtrak remains *sub judice*. <u>See</u> [LMI's] Letter Motion to Compel (Apr. 4, 2016), DE #342.

**AMTRAK'S MOTION TO COMPEL**

## I.     Recent Amendments to Rule 26

Amtrak challenges a number of entries included on the privilege logs of various

insurers.  See Amtrak Mem. at 4-9.[5]  Some of these challenges are substantive privilege

challenges, while others require this Court to consider the relevancy of particular documents

to the claims and defenses in this case.

As an initial matter, the Court addresses the governing "relevancy" standard under

Rule 26 of the FRCP.  Effective December 1, 2015, Rule 26 was amended to allow discovery

of

> any nonprivileged matter that is relevant to any party's claim or defense and
> proportional to the needs of the case, considering the importance of the issues
> at stake in the action, the amount in controversy, the parties' relative access to
> relevant information, the parties' resources, the importance of the discovery in
> resolving the issues, and whether the burden or expense of the proposed
> discovery outweighs its likely benefit.

Fed. R. Civ. P. 26(b)(1).  This amended rule governs "all proceedings in civil cases"

commenced after December 1, 2015, and, "insofar as just and practicable, all proceedings []

pending" as of that date.  See State Farm Mut. Auto. Ins. Co. v. Fayda, 14 Civ. 9792 (WHP)

(JCF), 2015 WL 7871037, at *2 (S.D.N.Y. Dec. 3, 2015) ("Fayda") (quoting Order re

Amendments to Federal Rules of Civil Procedure (Apr. 29, 2015)); see also Fed. R. Civ. P.

---

[5]  After Amtrak initially filed its motion to compel in November 2015, certain parties made
revisions to their respective privilege logs. Therefore, the Court ordered that all parties
submit to the Court, via ECF, their most recently served privilege log, see Electronic Order
(Apr. 14, 2016), resulting in the filing of numerous revised logs, see DE #359, #361-370.
The Court, in deciding Amtrak's motion, looks to the logs filed in response to the Court's
April 14, 2016 order, as opposed to the logs Amtrak filed with the Court in November 2015.

6

86(a)(2)(B) (amendments to the FRCP apply to pending proceedings unless "the court determines that applying them in a particular action would be infeasible or work an injustice"). Here, the Court finds it appropriate to apply the newly amended Rule 26 to this case, which was pending at the time the amendment took effect. In any event, the committee notes make clear that, under the amendments, "'the parties' responsibilities remain [] the same' as they were under the previous iteration of the rules, so that the party resisting discovery has the burden of showing undue burden or expense." Fayda, 2015 WL 7871037, at *2 (quoting Fed. R. Civ. P. 26(b)(1) advisory committee's note to 2015 amendment). Moreover, "[a] party claiming that a request is important to resolve the issues should be able to explain the ways in which the underlying information bears on the issues as that party understands them." Fed. R. Civ. P. 26(b)(1) advisory committee's note to 2015 amendment.

## II. Communications Included on the Insurers' Privilege Logs

### A. Communications with Reinsurers

Reinsurance "is a contract by which one insurer insures the risks of another insurer." North River Ins. Co. v. Ace Am. Reins. Co., 361 F.3d 134, 137 (2d Cir. 2004) (internal quotation and citation omitted). Amtrak seeks to compel certain insurers to produce communications with their reinsurers. See Amtrak 11/23/15 Mem. at 5; LMI 12/17/15 Opp. at 5.[6] In its motion papers, Amtrak claims that these reinsurance documents will provide

---

[6] These insurers are: AIC, Allianz, Allstate/Northbrook, Interstate, Argonaut, Continental, Munich Reinsurance America, Inc. ("Munich Re"), the AIG Companies, and Evanston. See Amtrak 11/23/15 Mem. at 5-7, 9.

Although Amtrak's motion papers broadly request reinsurance "information," see id., LMI
(continued…)

"relevant information in *identifying* the policies . . . and policy terms." <u>See</u> Amtrak 11/23/15 Mem. at 5 (emphasis added). LMI counter that "Amtrak provides no reason to believe there is any difficulty identifying such terms" and "gives no reason why such communications are likely to assist in 'identifying' policy terms." LMI 12/17/15 Opp. at 5.[7]

During oral argument, Amtrak, for the first time, suggested that these reinsurer communications would be relevant to the issue of notice. <u>See</u> 1/29/16 Tr. at 167-68. The Insurers objected to Amtrak's new argument and noted that the parties had not yet conferred on that issue. <u>See id.</u> at 195. Amtrak further argued that the reinsurer communications would "also go to policy interpretation to the extent that they're informing their reinsurance companies about the nature of the claim, the nature of the risk and the nature of the potential liability and it may also go to the amount of liability underlying it[.]" <u>Id.</u> at 204. Amtrak additionally claimed that such communications may show that the "reinsurance companies are the real parties in interest in this case." <u>Id.</u>

As an initial matter, the Court will not consider arguments that Amtrak did not raise in its moving papers. <u>See generally</u> Amtrak 11/23/15 Mem. Thus, the Court turns to Amtrak's

---

[6](...continued)
indicates in their opposition that Amtrak seeks only "communications with reinsurers," LMI 12/17/15 Opp. at 5. Neither party cites to any particular request in their papers. The Court will assume for purposes of this motion that Amtrak's request was limited to communications.

 The separate issue of whether Amtrak is entitled to disclosure of reinsurance agreements under Rule 26(a)(1)(A)(iv) is discussed below. <u>See</u> *infra* pp. 31-41.

[7] A footnote to LMI's memorandum of law adds the following: "If the Court is of the view that the reinsurance information sought by Amtrak is relevant, the insurers request an *in camera* review and an opportunity to show that the information is privileged or otherwise protected from disclosure." LMI 12/17/15 Opp. at 5 n.9.

need for the reinsurance communications in order to identify policies and policy terms.

Amtrak cites a single case in support of its demand for production of reinsurance information, <u>Suffolk Federal Credit Union v. Cumis Insurance Society, Inc.</u>, 270 F.R.D. 141, 142-43 (E.D.N.Y. Oct. 19, 2010). <u>See</u> Amtrak 11/23/15 Mem. at 6. But the <u>Suffolk</u> case dealt with entitlement to reinsurance agreements as a component of Rule 26 initial disclosures, not production of communications with reinsurers. <u>See</u> <u>Suffolk Fed. Credit Union</u>, 270 F.R.D. at 142-43.[8] At the hearing, as in its memorandum of law, Amtrak offered no explanation for its alleged need for reinsurer communications in order to identify policies or policy terms. Therefore, the Court denies this aspect of Amtrak's motion to compel.[9]

### B. Work Product

The work product doctrine, as partially codified in Rule 26(b)(3) of the FRCP, affords a qualified privilege for "documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)." Fed. R. Civ. P. 26(b)(3)(A); <u>see also</u> <u>United States v. Nobles</u>, 422 U.S. 225, 237-38 (1975); <u>United States v. Adlman</u>, 134 F.3d 1194, 1197 (2d Cir. 1998).[10] Work product protection also extends to "intangible work

---

[8] <u>See</u> discussion *infra* pp. 31-41 for discoverability of reinsurance agreements under Rule 26(a)(1)(A)(iv).

[9] Accordingly, the Court need not decide whether LMI's reservation of right with respect to its privilege claim (<u>see</u> *supra* p. 8 n.7) is a sufficient response to Amtrak's motion to compel.

[10] The privilege is qualified to the extent that, even where the applicability of the doctrine has been established, fact work product may be ordered disclosed upon a showing of substantial need. <u>See</u> *In re* <u>Honeywell Int'l, Inc. Secs. Litig.</u>, 230 F.R.D. 293, 298 (S.D.N.Y. 2003);

(continued…)

product," including "an attorney's analysis made in anticipation of litigation, but which has not been memorialized." United States v. Ghavami, 882 F.Supp.2d 532, 539 (S.D.N.Y. 2012) (citing Hickman v. Taylor, 329 U.S. 495, 505, 509-11 (1947)). The purpose behind the work product doctrine is to "preserve a zone of privacy in which a lawyer can prepare and develop legal theories and strategy 'with an eye toward litigation,' free from unnecessary intrusion by his adversaries." Adlman, 134 F.3d at 1196 (quoting Hickman, 329 U.S. at 510-11); see also In re Steinhardt Partners L.P., 9 F.3d 230, 234 (2d Cir. 1993) ("The logic behind the work product doctrine is that opposing counsel should not enjoy free access to an attorney's thought processes.").

A document is prepared in "anticipation of litigation," and therefore eligible for work product protection, "if in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation." Adlman, 134 F.3d at 1202 (citations and internal alterations omitted); accord Schaeffler v.United States, 806 F.3d 34, 43-44 (2d Cir. 2015). Conversely, "documents that are prepared in the ordinary course of business or that would have been created in essentially similar form irrespective of the litigation" do not qualify for work

_____

[10](...continued)
see also P. & B. Marina, Ltd. P'ship v. Logrande, 136 F.R.D. 50, 57 (E.D.N.Y. 1991), aff'd, 983 F.2d 1047 (2d Cir. 1992). Specifically, a party seeking discovery may obtain materials constituting fact work product upon a showing that the materials at issue are "otherwise discoverable under Rule 26(b)(1)" and that that party "has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means." Fed. R. Civ. P. 26(b)(3)(A)(i)-(ii).

product protection.  <u>Adlman</u>, 134 F.3d at 1202.

The proponent of the privilege bears the "heavy burden" to establish its existence.  <u>See</u> <u>In re</u> Grand Jury Subpoena Dated July 6, 2005, 510 F.3d 180, 183 (2d Cir. 2007).

   **1.  Continental**[11]

Amtrak challenges Continental's work product designation for "twenty-seven file notes that allegedly incorporate or summarize 'legal opinion, analysis, evaluation of attorney as to coverage issues prepared in anticipation of litigation,' which appear to be routine claim documents from between 2006 and 2010[.]"  Amtrak 11/23/15 Mem. at 7; <u>see id.</u> (taking the position that all pre-2014 documents claimed to be work product must be produced).[12]  Thus, Amtrak cites two reasons why this Court should reject Continental's claim of work product protection: (1) the timing of the creation of the documents at issue; and (2) the fact that they were created in the ordinary course of Continental's business.

At the outset of its motion, Amtrak states that the Insurers could not have reasonably anticipated litigation prior to 2014, when this coverage action was filed, because "work product protection generally attaches only after a declination in coverage."  Amtrak 11/23/15 Mem. at 5.  In opposition, the Insurers contend that Amtrak and certain insurers entered into

---

[11]  Amtrak also challenged the work product designation of certain documents listed by AIC, Allianz, Allstate/Northbrook, Interstate, and Century on their respective logs, but the parties report that those disputes have been resolved.  <u>See</u> 4/12/16 Status Report at 1-2.

[12]  Amtrak does not indicate by number which entries on Continental's log fall within this rubric, although it appears from a review of Continental's log that the relevant documents are No. 15 through No. 41.  <u>See</u> Continental Privilege Log (served Feb. 26, 2016) ("Continental Log") at 2-8, DE #361-1.

standstill agreements relating to the issues in this suit in or around 2005 and that those agreements "were made precisely because of the potential for litigation." LMI 12/17/15 Opp. at 2. Therefore, according to the Insurers, "[d]ocuments created in the lead-up to and after execution of the standstill agreements may be withheld as work product." Id. In connection with this argument, Continental has provided a copy of its standstill agreement with Amtrak, which was executed on January 30, 2006. See Confidentiality & Standstill Agreement (Jan. 30, 2006) ("Continental Standstill Agreement"), attached as Exhibit 1 to Frost Decl., DE #261.[13]

While Continental's standstill agreement supports the conclusion that, as of January 30, 2006, Continental could reasonably expect to find itself in litigation with Amtrak over the Policies, that conclusion does not necessarily entitle Continental to withhold *all* documents created after January 30, 2006. See Mid-Continent Cas. Co. v. Eland Energy, Inc., No. 3:07MC00078 (CFD), 2007 WL 2154177, at *2 (D. Conn. July 23, 2007) ("Although the disputed documents may qualify as work product from a temporal perspective, the work product privilege does not shield documents 'that are prepared in the ordinary course of business or would have been created in essentially similar form irrespective of litigation.'") (quoting In re Grand Jury Proceeding, 79 F.App'x 476, 477-78 (2d Cir. 2003)). Amtrak challenged the withheld documents based not only on *when* they were created but also on the

_____

[13] The copy submitted by Continental was executed only by Continental. See Continental Standstill Agreement. As Amtrak has not denied that it entered into the agreement, the Court presumes that Amtrak also executed the document.

ground that they were "routine claim documents."  See Amtrak 11/23/15 Mem. at 7.

Nevertheless, with the exception of a brief description of Document No. 41 on Continental's

log,[14] neither Continental nor LMI offered any argument or evidentiary support for why these

"file note" documents are not "routine" claim documents.  See generally Frost Decl.; LMI

12/17/15 Opp.  Beyond the notations on the log itself, Continental has provided the Court with

no information concerning the nature of the withheld documents or how they differ from the

type of documents that could be characterized as routine in the insurance industry.

LMI's own opposition brief recognizes that the relevant work product standard

requires a factually specific inquiry.  See LMI 12/17/15 Opp. at 2 ("Work product protection

requires only that 'in light of the *nature of the document* and the *factual* situation in the

*particular* case, the document can fairly be said to have been prepared or obtained because of

the prospect of litigation.'") (quoting Adlman, 134 F.3d at 1202) (emphasis added); see also

Magee v. The Paul Revere Life Ins. Co., 172 F.R.D. 627, 640 (E.D.N.Y. Mar. 21, 1997)

("The determination of whether a document qualifies for work product immunity requires a

fact-sensitive inquiry by the Court.").

Indeed, numerous courts have recognized the inherent difficulty in assessing work

product claims made by an insurance company and the insurance company's consequent need

to provide support for its work product claims.  See Safeco Ins. Co. of Am. v. M.E.S., Inc.,

No. 09-CV-3312 (ARR) (VMS), 2013 WL 1680684, at *5 (E.D.N.Y. Apr. 17, 2013)

---

[14] According to Continental's Log, Document No. 41 relates to "internal settlement
deliberations."  See Continental Log at 8.

("Because all insurance investigations are likely performed with an eye towards the prospect of future litigation, it is particularly important that the party opposing production . . . demonstrate by *specific and competent* evidence that the documents were created in anticipation of litigation.") (citations and internal quotations omitted) (emphasis added); Tudor Ins. Co. v. Stay Secure Constr. Corp., 290 F.R.D. 37, 40-41 (S.D.N.Y. 2013) (holding that insurance company's reports were not protected by work product privilege, where the company "provided no competent evidence to support its implicit factual argument that the [investigatory] reports would not have been prepared 'in essentially similar form'" had the litigation not been filed) (quoting Adlman, 134 F.3d at 1202); OneBeacon Ins. Co. v. Forman Int'l, Ltd., No. 04 Civ. 2271 (RWS), 2006 WL 3771010, at *6 (S.D.N.Y. Dec. 15, 2006) (holding that it was insurer's "burden to demonstrate that the documents" created during its claims investigation process were protected by, *inter alia*, work product privilege, and that that burden was not discharged by "unsworn statements in legal memoranda").

Then District Judge Gerard Lynch summed up the rationale underlying these legal principles in Weber v. Paduano, No. 02 Civ. 3392(GEL), 2003 WL 161340 (S.D.N.Y. Jan. 22, 2003):

> [C]ourts presented with work product disputes in the insurance context must be careful not to hold that documents are protected from discovery simply because of a party's "ritualistic incantation" that all documents created by insurers are made in preparation for litigation, and mindful of the fact that insurer-authored documents are more likely than attorney-authored documents to have been prepared in the ordinary course of business, rather than for litigation purposes. American Ins. Co. v. Elgot Sales Corp., No. 97 Civ. 1327(RLC)(NRM), 1998 WL 647206, at *1 (S.D.N.Y. Sept. 21, 1998) (discussing need for limiting principle to avoid allowing "virtually the entirety of an insurance company's files" to

be exempt from discovery). Overprotecting insurance documents would hinder the broad discovery contemplated by the Rules, while doing little to foster uninhibited deliberation concerning insurance claims, since insurers have a duty—as well as business incentive—to carefully investigate every potential claim, whether or not it will likely erupt into litigation. See, e.g., Fine v. Bellefonte Underwriters Ins. Co., 91 F.R.D. 420, 422 (S.D.N.Y.1981).

Thus, in the insurance context, it is particularly important that the party opposing production of the documents, on whom the burden of proof as to privilege rests, demonstrate by specific and competent evidence that the documents were created in anticipation of litigation. Harrigan v. Electronic Pre–Press Systems, Inc., No. 90 Civ. 4081(MEL), 1992 WL 121438, at *3 (S.D.N.Y. May 15, 1992). A party withholding insurance documents may not rest on conclusory allegations of privilege, but must establish, by objective evidence, that the author of the document anticipated litigation at the time that the document was created, and would not have created the document in essentially the same way had the prospect of litigation not existed. Adlman, 134 F.3d at 1202.

Weber, 2003 WL 161340, at *4. Indeed, "even documents created after the institution of litigation must be proven to have been created because of the lawsuit." Id. at *13.

Because Continental and LMI have failed to show by specific, competent evidence that the challenged documents were not created in the ordinary course of business, the documents are not entitled to work product protection.[15] However, Continental has also asserted claims

---

[15] In an argument relegated to a footnote, the Insurers assert that "before ordering production of any [allegedly privileged] documents, the Court should review them *in camera*." LMI 12/17/15 Opp. at 2 n.4. Suffice it to say, to quote Judge Lynch:

[I]n camera review of the documents, while potentially helpful to the determination of privilege, is not to be routinely undertaken as a substitute for a party's submission of an adequate record for its privilege claims, especially where, as here, the Court would have to examine a large quantity of documents. . . .

(continued...)

of attorney-client privilege for all but one of those documents — Document No. 41 — and

Amtrak's motion does not challenge that privilege assertion.  <u>See</u> Continental Log at 2-8.

Therefore, even in the absence of work product protection, Continental need not produce the

challenged file notes referenced in entries No. 15 through No. 40.

As for Document No. 41, Continental alleges that it is a "[c]onfidential [m]atter"

subject to Rule 408 of the Federal Rules of Evidence.  <u>See</u> Continental Log at 8 (entry No.

41).  While Amtrak has challenged the Insurers' withholding of documents based on

confidential settlement communications, the parties, including Continental, are working

toward a resolution of that issue.  <u>See</u> discussion <i>infra</i> p. 19.  Consequently, the Court will

deny Amtrak's motion to compel No. 41 without prejudice, subject to reinstatement in the

event the parties are unable to agree on the discoverability of confidential settlement

communications.

### 2.  The AIG Companies

Amtrak also challenges the assertions of work product protection on the AIG

Companies' log.  <u>See</u> Amtrak 11/23/15 Mem. at 8.  In particular, Amtrak questions the

propriety of the AIG Companies' work product designation "for over fifty-two Claim Notes,

Notes, Summaries, Charts, Memos or Emails from between 2006 and 2012, when these

---

[15](...continued)
> Given the scanty factual showing in the defendants' privilege
> logs and motion papers, in camera review of the documents,
> even had the defendants provided them to the Court, is not
> warranted.

<u>Weber</u>, 2003 WL 161340, at *13 (citation, internal quotation marks and ellipses omitted).

companies did not anticipate litigation." See id.[16]  In response, the AIG Companies submit a

copy of a standstill agreement between Amtrak and Pennsylvania Insurance Company and

Granite, two companies included in the AIG Companies group.  See Confidentiality and

Standstill Agreement (dated Apr. 21, 2005), DE #262-1.

Although the AIG Companies' opposition does not address whether the remaining

entities that comprise the AIG Companies entered into similar standstill agreements, even

assuming they did, those agreements do not save the AIG Companies' work product claims.

Like Continental, the AIG Companies present no argument or evidence whatsoever, let alone

specific or competent evidence, as to why these challenged documents cannot be said to have

been created in the ordinary course of business.[17]

---

[16]  Frustratingly, neither side bothers to identify these documents and Amtrak's description of them is not specific enough to make clear to the Court which entries on the privilege log correspond to these "Claim Notes, Notes, Summaries, Charts, Memos or Emails."  See AIG Companies Privilege Log (dated Apr. 11, 2016) ("AIG Log"), DE #359; see also supra p.11 n.12.

In addition to those fifty-two documents, Amtrak challenged other AIG privilege designations on the basis that the descriptions failed to provide sufficient identifying information.  See Amtrak 11/23/15 Mem. at 7-8.  The parties later resolved those issues.  See 4/12/16 Status Report at 2.

[17]  To be sure, in the section discussing the AIG Companies in particular, Amtrak seems to limit its argument to a temporal one.  See Amtrak 11/23/15 Mem. at 8 (arguing about "Claim Notes, Summaries, Charts, Memos or Emails from between 2006 and 2012, when these companies did not anticipate litigation . . .").  Nevertheless, earlier in Amtrak's motion, during a more general discussion of problems arising from various Insurers' privilege logs, Amtrak argues that "Claim Notes, Notes, Summaries, Charts, Memos or Emails" are not covered by work product because "[i]nsurance companies are in the business of investigating and evaluating claims."  Id. at 5.  Because Amtrak's description of the documents withheld by the AIG Companies is almost identical to the description used in its argument that the Insurers' documents were prepared in the ordinary course of business, Amtrak's challenge as

(continued...)

For the reasons stated in connection with Continental's assertion of work product protection, see supra pp. 12-15, the Court concludes that the AIG Companies have not met their burden to establish by competent evidence that the fifty-two documents at issue are protected as work product. To the extent that, as to any document, the AIG Companies' log asserts other privileges that Amtrak has not specifically challenged (e.g., the attorney-client privilege), then the AIG Companies need not produce that document. See, e.g., AIG Log at 2 (asserting attorney-client and work product privilege over several "Memo" documents).

### 3. Nationwide and Wausau

Amtrak seeks the production of eighteen documents listed on the Nationwide and Wausau log that are "from between 2005 and 2012." See Amtrak 11/23/15 Mem. at 8; Nationwide/Wausau Log, DE #362-1. In opposition, counsel for Nationwide and Wausau submits a declaration attesting to the fact that he has reviewed the eighteen work product documents at issue. See McElroy Decl. ¶ 3. Notably, counsel proffers that "[e]ach of the eighteen documents" involved "communications between in-house counsel Bob Kuehn and Sue Woller (who was responsible for handling the bodily injury claims at issue in this litigation) regarding legal advice pertaining to the claims at issue and . . . [was] created in connection with settlement demands which had been made by Amtrak's counsel [] with respect to the bodily injury claims at issue in this litigation." Id. ¶¶ 3-4.

---

[17](...continued)
to the AIG Companies' log may reasonably be construed to include both a temporal challenge and one based on the nature of the documents.

Thus, in contrast to Continental and the AIG Companies, Nationwide and Wausau offered evidence supporting their work product assertions. Therefore, the Court finds these documents are entitled to work product protection.[18]

### C. Confidential Settlement Information

According to the 4/12/16 Status Report, the "parties continue to discuss a stipulation concerning settlement communications, and believe a resolution can be reached without Court intervention." 4/12/16 Status Report at 5. In light of this circumstance, the Court denies, without prejudice, this aspect of Amtrak's motion to compel, which Amtrak may reinstate by letter if the parties fail to reach agreement.[19]

## III. Manuals

### A. Underwriting and Claims Manuals

Amtrak claims that the Insurers' underwriting and claims manuals are "crucial to understanding the insurance companies' interpretation of its insurance policies" because they "set forth, among other things, what documents constitute a policy and include drafting history that is relevant to determining the meaning of disputed policy language." Amtrak 11/23/15 Mem. at 9-10. Amtrak also argues that the claims manuals are "relevant as to whether Amtrak's claims were properly handled." Id. at 11.

---

[18]  In any event, even if Nationwide and Wausau had failed to substantiate their assertion of work product privilege, the Court would not order production of the documents, as their invocation of attorney-client privilege remains unchallenged. See Nationwide/Wausau Log.

[19]  Similarly, the parties were able to resolve several other issues raised by Amtrak's motion to compel, such that no intervention is required. These disputes concern the following: (1) reserve information; (2) premium and commission calculations; and (3) Munich Re's illegible documents. See 4/12/16 Status Report at 2, 4; 3/24/16 Status Report at 2.

In opposing the motion, LMI argue that claims and underwriting manuals constitute extrinsic evidence that cannot be used to interpret unambiguous policy language. See LMI 12/17/15 Opp. at 10.[20] In addition, LMI take issue with the scope of Amtrak's request, noting that Amtrak seeks documents "from a time well after the policies in question were issued, which cannot bear on the contemporaneous mutual intent of the parties at the time of their issuance." Id. Finally, with respect to the proper handling of Amtrak's claims, LMI point out that there are "no allegations of improper claims handling" in this matter. Id. The Insurers suggested at the January 29th hearing that, if the Court were inclined to order production of the claims manuals, then any production should be limited to those portions of the claims manuals that deal with interpretation, as well as to the time when the policy was issued. See 1/29/16 Tr. at 238 (requesting that the Court limit production in a manner similar to the ruling in Champion Int'l Corp. v. Liberty Mutual Insurance Co., 129 F.R.D. 63 (S.D.N.Y. 1990)).

As a preliminary matter, the Court rejects LMI's argument that the internal guidelines and manuals are immune from discovery on the ground that "the court will interpret the unambiguous policy language as a matter of law" and, "even if Amtrak could demonstrate

_____

[20] At the January 29th hearing, the Insurers claimed that the underwriting manuals contained no information that would bear on policy interpretation and merely addressed procedural matters. See 1/29/16 Tr. at 232-34. Amtrak conceded that the underwriting manuals, in contrast to the claims manuals, might have less bearing on interpretation, but argued that even the "procedural" aspects of an underwriting manual would be relevant. See id. With respect to claims manuals, the Insurers described them as "procedural and administrative." Id. at 238 ("It doesn't interpret policy language at all."). Amtrak disputes the Insurers' characterization of the claims manuals and contends that those manuals "contain information . . . that bear upon inconsistent interpretations." Id. at 240.

ambiguity, only extrinsic evidence of the mutual intent between Amtrak and the insurer in question could be relevant." LMI 12/17/15 Opp. at 10. In <u>Champion International</u>, 129 F.R.D. at 67-68, and <u>Mariner's Cove Site B Associates v. Travelers Indemnity Company</u>, No. 04CIV.1913(KMW)(RLE), 2005 WL 1075400, at *1 (S.D.N.Y. 2005), the courts considered and rejected similar arguments, for reasons that this Court finds persuasive. LMI's objection that unambiguous policy language cannot be undermined through extrinsic evidence presents a challenge that goes to admissibility, as opposed to discoverability. <u>See Malinowski v. Wall St. Source, Inc.</u>, No. 09 Civ. 9592(JGK)(JLC), 2011 WL 1226283, at *1 (S.D.N.Y. Mar. 18, 2011) ("[A]dmissibility is not a prerequisite to discoverability, and the scope of relevance under Rule 26 is broader than under the Rules of Evidence.") (citation and internal quotation marks omitted); <u>GBTI, Inc. v. Ins. Co. of State of Pa.</u>, No. 1:09cv1173 LJO DLB, 2010 WL 2942631, at *4 (E.D. Cal. July 23, 2010) (finding underwriting manuals discoverable and noting that, "[a]t the discovery stage, the Court does not decide whether parol evidence will or will not be admitted to address interpretation of the policy"); <u>Young v. Liberty Mut. Ins. Co.</u>, No. 3:96-CV-1189 (EBB), 1999 WL 301688, at *5 (D. Conn. Feb. 16, 1999) (noting that "even if the Court were to ultimately conclude that the CGL [comprehensive general liability] policies at issue are unambiguous, this should not prevent the plaintiffs from discovering evidence which may present an ambiguity in the CGL policies at issue"). In this case, the District Court has not yet addressed the ambiguity of any policy term, and, thus, LMI's objection to discovery on this basis is premature.

On the other hand, the absence of a per se bar to discoverability does not answer the question of whether and to what extent Amtrak is entitled to production of Insurers' internal manuals. In its motion papers, Amtrak cites a line of cases to support its contention that courts "routinely" compel the production of claims and underwriting manuals. See 1/29/16 Tr. at 239 (referencing Amtrak 11/23/15 Mem. at 9 & n.6). As reflected in LMI's competing string-cite, see LMI 12/17/15 Mem. at 9 & n.15, the case law is, however, more decidedly mixed than Amtrak suggests, especially where, as here, the pleading contains no claim of bad faith or recission. Compare, e.g., Naylor v. Navigators Ins. Co., No. 12-CV-297 BEN (WMc), 2012 WL 4760912, at *2 (S.D. Cal. Oct. 5, 2012) (denying plaintiff's request for underwriting manuals, which plaintiff argued would be relevant to "interpret the insurance policy language," as risk assessment and costs of coverage and/or premiums were not at issue in that case); Royal Bahamian Ass'n, Inc. v. QBE Ins. Co., 268 F.R.D. 692, 694-95 (S.D. Fla. 2010) (finding that standard operating procedures and underwriting guidelines were irrelevant to an insurance breach of contract claim, as opposed to a bad faith claim), with, e.g., Weaver v. Lexington Ins. Co., No. 8:05-CV-1913-T-27TBM, 2007 WL 570018, at *2 (M.D. Fla. Feb. 20, 2007) (finding that plaintiffs had demonstrated that the "underwriting guidelines, in part, may contain matters supportive to their claim that there were no material misrepresentations"). In short, Rule 26 requires the Court to consider the particular circumstances of the case before it, and Amtrak's one-size-fits-all approach to insurance cases is unavailing. See Fed. R. Civ. P. 26(b)(1) ("Parties may obtain discovery regarding any

nonprivileged matter that is relevant to any party's claim or defense and *proportional to the needs of the case . . . .*") (emphasis added).

Having weighed the arguments for and against disclosure, the Court, in its discretion, grants in part and denies in part Amtrak's motion to compel production of internal claims and underwriting manuals. See Champion Int'l Corp., 129 F.R.D. at 68 (holding that claims manual were "germane to the interpretation of [insurance] policies"); Mass. Mut. Ins. Co. v. Beeharilal, No. 14-85-JWD-RLB, 2015 WL 1346242, at *9 (M.D. La. Mar. 24, 2015) (finding claims guidelines relevant to issues of both bad faith and interpretation); U.S. Fire Ins. Co. v. City of Warren, No. 2:10-CV-13128, 2012 WL 1454008, at *9 (E.D. Mich. Apr. 26, 2012); cf. Cement & Concrete Workers Dist. Council Pension Fund v. Ulico Cas. Co., 387 F.Supp.2d 175, 182 (E.D.N.Y. 2005) ("Ulico Cas.") (noting that the "usual practice of the district courts in the Second Circuit does appear to be to allow documents pertaining to drafting history to be discovered in coverage disputes by parties adverse to insurance companies") (citing, *inter alia*, Mariner's Cove, 2005 WL 1075400, at *1; Young, 1999 WL 301688, at *5).[21]

---

[21] In Ulico Casualty, the magistrate judge refused to compel disclosure of documents relating to the drafting history of the policy at issue. See 387 F.Supp.2d at 182. LMI cite that case for the proposition that Amtrak failed to establish how the manuals sought were relevant "to a determination of the parties' mutual intent." See LMI 12/17/15 Opp. at 10 & n.19. However, LMI overlook the fact that the district court, in granting the defendant's motion for summary judgment in Ulico, declined to adopt the magistrate's discovery ruling. See Ulico Cas., 387 F.Supp.2d at 182 (ruling that the "decision to allow only limited discovery in the run up to this summary judgment motion, even if incorrect, does not mean that summary judgment may not be granted at this time").

The production of the claims and underwriting manuals should be limited as follows: the Insurers are directed to produce manuals that "discuss[] the disputed policy provisions for the time period of coverage." Champion, 129 F.R.D. at 66.[22]

## B.    Document Retention/Destruction Policies and Procedures

Amtrak argues that document retention/destruction policies and procedures are relevant because they will shed light on Policies that are missing or incomplete. See 1/29/16 Tr. at 241-42. While arguing that such manuals are "per se" relevant, see id. at 241, Amtrak cites no supporting case law in its memorandum of law, and proffered no precedent during the hearing. See Amtrak 11/23/15 Mem. at 9-11; 1/29/16 Tr. at 241-42. LMI counter that document retention policies are discoverable only "where the request for such information is tied to a party's ability to produce relevant information." LMI 12/17/15 Opp. at 11-12. In particular, LMI argue that because "Amtrak has not shown that *claims or underwriting*

_____

[22]  In a footnote to its discussion of the relevance of the manuals, LMI state that "[c]ertain" unidentified defendants

> have also objected to the production of claims and underwriting manuals on other grounds, including that such documents are confidential and/or proprietary in nature. If the Court is of the view that the manuals sought by Amtrak are relevant, the insurers request an *in camera* review of such documents.

LMI 12/17/15 Opp. at 11 n.22. This placeholder argument is, however, too little too late. The Insurers have made no showing whatsoever to support their perfunctory statement that the manuals are confidential and/or proprietary. Therefore, the Court denies their request for an *in camera* document dump. See Safeco Ins. Co. of Am. v. M.E.S., Inc., 289 F.R.D. 41, 52 n.11 (E.D.N.Y. 2011) ("Safeco offers nothing except for the conclusory assertion that its claims manuals are entitled to protection, and its request is therefore denied."); cf. *supra* pp.15-16 n.15.

*manuals* are relevant, no predicate exists for its demands that insurers produce document retention policies." Id. at 12 (emphasis added). As the Court has found that claims and underwriting manuals are relevant in this matter, Amtrak's argument is unavailing. See *supra* pp. at 22-24.

The Court grants this aspect of Amtrak's motion in limited part. To the extent that a particular Policy is either missing or incomplete, that party must turn over the document retention and/or destruction manuals in place from the time of coverage through the present. Cf. Champion Int'l Corp., 129 F.R.D. at 66.[23]

## IV.    Regulatory Filings

In its original motion to compel, Amtrak sought an order directing various Insurers "to produce information relating to submissions to government bodies, regulatory agencies or other entities regarding the meaning of the pollution exclusion that appears in differing forms in a number of the [P]olicies." See Amtrak 11/23/15 Mem. at 11.[24] Amtrak stated that these submissions, which relate to the meaning of policy language, would provide useful information "in determining the meaning of disputed policy terms[,]" as they show what the

---

[23]  The Court's rulings with respect to claims, underwriting, and retention/destruction manuals do not apply to Banco or Evanston; "as to those insurers these issues have been resolved." LMI 12/17/15 Opp. at 11 n.23.

[24]  The document demand in question (Doc. Request No. 8) reads as follows:

> 8.  Produce all Documents constituting or relating to any filing, submission or representation that You made to any insurance regulatory body or authority concerning any exclusion or other policy provision purporting to exclude coverage for losses caused by pollution of any kind.

Amtrak 11/23/15 Mem. at 11-12 n.13.

insurers "were telling regulators" about new provisions and thus constitute part of "the drafting history," 1/29/16 Tr. at 182; see Amtrak 11/23/15 Mem. at 12; 1/29/16 Tr. at 179-80 ("[W]hat these documents do is explain to the insurance commissioner what the terms of the insurance policy are that are being changed, how they're being changed, and provide an explanation so that the insurance commissioner understands the change in coverage being provided under certain types of policies and certain types of exclusions for other policy terms.").

In its submission opposing Amtrak's motion, LMI responded that "[t]he contention that statements made to regulators should be considered when interpreting policy language (commonly referred to as a 'regulatory estoppel' argument) has been flatly rejected in New York and other jurisdictions." LMI 12/17/15 Opp. at 12 (citing cases). Consequently, according to LMI, the requested documents "are not relevant to policy interpretation and are not discoverable." Id.; see 1/29/16 Tr. at 215-17. However, as the Court noted at oral argument, see id. at 215-16, the regulatory estoppel cases cited by LMI did not address the issue of discoverability, but merely ruled that an insurer who makes certain statements to a regulatory body is not precluded from thereafter taking a position inconsistent with those representations. See cases cited in LMI 12/17/15 Opp. at 12. As the Court further observed, it does not follow from the courts' rejection of the regulatory estoppel doctrine that communications with the regulators are necessarily irrelevant; and the admissibility of those documents is not an issue that need be addressed at this stage of the litigation. See 1/29/16 Tr. 215-17; Century Surety Co. v. Smith, Civil Action No. 14-cv-00947-RM-MJW, 2014 WL

7666061, at \*2-3 (D. Colo. Jan. 21, 2014) (ruling that documents submitted by insurer to regulatory agencies were discoverable, but limiting the production "to the policy clauses and endorsements specifically in dispute between the parties"); cf. cases cited *supra* p. 21.

The Court therefore ruled from the bench that the Insurers should produce regulatory filings responsive to Amtrak's "limited" demand, which related specifically to policy provisions excluding coverage for pollution-related injuries. See 1/29/16 Tr. at 218. In its minute entry addressing the issue, the Court summarized its ruling as follows:

> []For the reasons stated on the record, the Court grants in part Amtrak's motion to compel production of documents submitted to regulatory bodies, but only to the extent specified in Amtrak's Document Request No. 8.

2/1/16 Minute Entry at 2.

### A. Exclusions Covered By The Court's Ruling

Following this order, the parties continued to confer in an attempt to informally resolve their dispute regarding regulatory submissions. In their 2/19/16 Status Report, the parties reported conflicting interpretations of the Court's ruling, and the Insurers sought "clarification from the Court with respect to the scope of documents to be produced . . . ." 2/19/16 Status Report at 5. Specifically, the controversy concerned a brief comment from the bench following the Court's oral ruling that regulatory submissions were discoverable, and just as the discussion was about to turn to an entirely difference topic. At the hearing, counsel for First State, who was addressing this issue on behalf of the Insurers, stated that Amtrak's document demand was limited to exclusions for losses caused by pollution. See 1/29/16 Tr. at 213, 218. Thereafter, counsel for Wausau and Nationwide questioned the Court about his

clients' obligation to respond to Amtrak's request.  See id. at 219.  In particular, counsel

noted that the Wausau and Nationwide Policies did not contain any pollution exclusion

provisions, and, as such, he did not believe that his clients should have to produce any

documents relating to regulatory submissions.  See id.  Wishing to wrap up the argument on

regulatory submissions, and without verifying the precise language of Amtrak's Document

Request No. 8, the Court cut short counsel's remarks with this statement:  "I agree with you."

See id.

It is that brief comment from the bench that has spawned conflicting views as to the

scope of the production ordered by the Court.  The Insurers contend that their disclosures

should be limited to "submissions from each insurer concerning the pollution exclusion(s)

actually contained in their policies."  4/12/16 Status Report at 3.  Amtrak, on the other hand,

takes the position that the Insurers' disclosures should not be limited to regulatory submissions

addressing "'absolute' pollution exclusion[s]," but should also include submissions "relating

to the pollution exclusion, including the 'sudden and accidental' . . . exclusions."  Id.  Amtrak

goes even further, demanding production of each Insurer's submissions regarding such

exclusions even if not contained in their own Amtrak Policies.  See id.

Neither position accurately reflects the intended scope of the Court's ruling.  First, to

the extent that the Court's comment at oral argument could be construed to mean that only

regulatory submissions regarding "absolute" pollution exclusions are subject to disclosure,

that comment was predicated on the Insurers' imprecise description of Amtrak's document

demand: The demand is not limited to "provisions pertaining to pollution exclusions" (1/29/16

Tr. at 213, 218), but more broadly calls for submissions "concerning any exclusion or other policy provision purporting to exclude coverage for losses caused by pollution of any kind." See *supra p.* 25 n.24. Thus, even if a Policy has no absolute or per se exclusion for pollution, regulatory submissions concerning other policy provisions purporting to exclude coverage for pollution-related losses – such as submissions regarding the meaning of "sudden and accidental" – must be produced.

Nevertheless, Amtrak's insistence that each Insurer produce regulatory submissions regarding pollution-related exclusions that are not contained in its Policies with Amtrak goes too far in the opposite direction and ignores the spirit of the Court's comment at oral argument. It was not the Court's intent to require Insurers to produce regulatory submissions that do not pertain to provisions in their own Policies with Amtrak, so that Amtrak can seek to use those submissions against other Insurers whose Policies contain such provisions. That is not part of the "drafting history" sought by Amtrak. See 1/29/16 Tr. at 182.

### B. Temporal Scope of Production

As for the temporal scope of production -- an issue no party raised in their papers or at oral argument -- the parties, in their 2/19/16 Status Report, initially informed the Court that they had agreed to limit the period of the request "to the time of issuance of the policies at issue, i.e., from June 1972 to October 1985." 2/19/16 Status Report at 2. That agreement carried over to their next status report. See 3/4/16 Status Report at 3 ("Thus, the parties have only been able to agree that the time period of production of regulatory filings concerning the pollution exclusion will be the time of issuance of the policies at issue, from June 1972 to

October 1985."). Several weeks later, however, the parties' agreement as to the temporal

scope unraveled. <u>See</u> 3/24/16 Status Report at 2 (noting that Amtrak now took the position

that the relevant time period should extend up until October 1986).

Having considered the parties' positions regarding the temporal scope of production,

the Court concludes that the end date should correspond to the period (up through October

1986) during which the Insurers were communicating with regulators about provisions in

Amtrak Policies that were then in effect or thereafter issued. Whether that end date extends

through October 1986 depends on whether any post-October 1985 regulatory submissions

concerned pollution-related exclusion provisions in Policies previously issued.

## V.       Leader-Only Discovery

During the January 29th oral argument, Amtrak for the first time objected to LMI's

decision to produce documents only from the files of the lead underwriters on the Policies

(i.e., so-called "leader-only" discovery). <u>See</u> 1/29/16 Tr. at 119. In the 4/12/16 Status

Report, the parties indicate that they "are continuing to attempt to resolve their dispute over

'leader-only' discovery." 4/12/16 Status Report at 5. Therefore, the Court declines to

address this issue at this time. If the parties are unable to reach agreement, Amtrak may

reinstate its request in a letter to the Court.

## VI.      Attorney's Fees and Costs

At the conclusion of its motion to compel, Amtrak requests that, pursuant to Rule

37(a)(5) of the FRCP, "the Court must award fees for the effort in preparing a motion to

compel[.]" Amtrak 11/23/15 Mem. at 15. As the Court has granted in part and denied in

part Amtrak's motion, the Court is permitted, but not required, to award Amtrak's fees and costs in bringing its motion. See Fed. R. Civ. P. 37(a)(5)(C) ("If the motion is granted in part and denied in part, the court . . . *may*, after giving an opportunity to be heard, apportion the reasonable expenses from the motion.") (emphasis added). The Court, in its discretion, declines to award fees and costs to Amtrak for its motion to compel.

## REINSURANCE AGREEMENTS

By separate motion, LMI and certain defendant-insurers[25] seek a determination from the Court that the mandate of Rule 26(a)(1)(A)(iv) of the FRCP to turn over "insurance" agreements as part of a party's initial disclosures does not obligate that party to produce *reinsurance* agreements. See generally LMI 4/7/16 Mot. Amtrak opposes the motion. See Amtrak 4/18/16 Opp.; Amtrak Opp. to First State; see also Reply in Support (Apr. 25, 2016) ("LMI 4/25/16 Reply"), DE #378.

In essence, LMI contend that, although reinsurance is a type of insurance, the term "reinsurance" and "insurance" are not interchangeable and that treating them as such for purposes of Rule 26(a)(1)(A)(iv) does not further the policies underlying the Rule. See LMI 4/7/16 Mot. at 1-2. Moreover, according to LMI, reinsurance does not affect an insurer's ability to pay a judgment and that producing such agreements would be unduly burdensome as to some insurers. See id. at 3-4. Finally, LMI argue that, even if Rule 26(a)(1)(A)(iv)

---

[25] A list of insurers who joined in LMI's motion is set forth in Appendix A attached thereto. See LMI 4/7/16 Mot. at 6. Following the filing of this motion, additional insurers moved to join in LMI's motion. See [Nationwide/Wausau] Motion for Joinder (Apr. 8, 2016), DE #347; [Century] Motion for Joinder (Apr. 13, 2016), DE #355. First State filed a separate motion for a protective order. See First State Mot.; Amtrak's Opp. to First State.

contemplates the disclosure of reinsurance agreements, they should not be required to produce

them in this case.  See LMI 4/7/16 Mot. at 5.  In support of their motion, LMI submit a series

of declarations from individuals who have experience working in the London insurance market

and familiarity with certain reinsurance agreements relevant to this matter.  See, e.g.,

Declaration of Gary Bartlett (Apr. 7, 2016), DE #345-5.

In opposition, Amtrak urges that both case law and the rationale of Rule

26(a)(1)(A)(iv) require the production of reinsurance agreements.  See Amtrak 4/18/16 Opp.

at 1-4.  Amtrak also argues that LMI have failed to establish that producing the reinsurance

agreements would cause an undue burden and that the declarations LMI submitted only offer

self-serving and generic opinions.  See id. at 4-5.[26]

## I.      Legal Standard

Pursuant to Rule 26(a)(1)(A)(iv), a party must, without awaiting a discovery request,

provide the other parties in the litigation with "any insurance agreement under which an

insurance business may be liable to satisfy all or part of a possible judgment in the action or to

---

[26]  In what appears to be an effort to circumvent this Court's page limits, Amtrak filed a
separate motion seeking to strike LMI's declarations for failing to comply with the Federal
Rules of Evidence.  See Amtrak 4/18/16 Mot.  The Court denies Amtrak's motion, which
expands upon points already made in its opposition.  See Amtrak 4/18/16 Opp. at 4 & nn.10,
14, 15; see also Sharma v. Burberry Ltd., 52 F.Supp.3d 443, 454 (E.D.N.Y. Sept. 4, 2014)
(declining to give "a second bite at the apple" and denying motion to strike declarations in
support of motion for conditional certification under the Fair Labor Standards Act, where
arguments should have been made in the opposition memorandum of law and not filed as a
separate motion).  Even in the Rule 56 context, courts routinely disregard or give less weight
to inappropriate or inadmissible evidence in lieu of striking declarations outright.  See Ross
Univ. Sch. of Med., Ltd. v. Brooklyn-Queens Health Care, Inc., No. 09-CV-1410 (KAM),
2012 WL 6091570, at *6 (E.D.N.Y. Dec. 7, 2012) (collecting cases), adopted in relevant
part, 2013 WL 1334271 (E.D.N.Y. Mar. 28, 2013).

indemnify or reimburse for payments made to satisfy the judgment." Fed. R. Civ. P. 26(a)(1)(A)(iv). According to the advisory committee's note for former Rule 26(b)(2), the predecessor to Rule 26(a)(1)(A)(iv),[27] insurance agreements "enable counsel for both sides to make the same realistic appraisal of the case, so that settlement and litigation strategy are based on knowledge and not speculation." Fed. R. Civ. P. 26(b)(2) advisory committee's note to 1970 amendment. "Disclosure is required when the insurer 'may be liable' on part or all of the judgment[,]" and "[i]t is immaterial whether the liability is to satisfy the judgment directly or merely to indemnify or reimburse another after he pays the judgment." Id.

## II.    Discussion

The Court concludes that Amtrak is entitled to reinsurance agreements under Rule 26(a)(1)(A)(iv) — a conclusion that is supported by the majority of the precedent addressing this issue, the plain language of Rule 26(a)(1)(A)(iv), and the policy and purpose of Rule 26.

### A.    Case Law

Most federal courts across the country that have examined this issue, including at least one within this district, have determined that the reference in Rule 26(a)(1)(A)(iv) to "any insurance agreement" includes reinsurance agreements. See Suffolk Fed. Credit Union, 270 F.R.D. at 142 ("Although case law is sparse within the Second Circuit, the few cases to consider the issue have determined that reinsurance information is indeed discoverable.")

---

[27] Rule 26(a)(1)(A)(iv) was previously codified at Rule 26(a)(1)(D), which contained the same relevant language as Rule 26(a)(1)(A)(iv), and, before that, Rule 26(b)(2) dealt with requests for insurance information. See Fed. R. Civ. P. 26(a)(1) advisory committee's note to 2000 amendment (noting that former Rule 26(b)(2) had been deleted from the FRCP "as redundant in light of" what was then to be Rule 26(a)(1)(D)).

(collecting cases); see also Century Surety Co., 2014 WL 7666061, at *3 (holding that Rule 26(a)(1)(A)(iv) applies to reinsurance agreements); First Horizon Nat'l Corp. v. Certain Underwriters at Lloyd's, No. 2:11-CV-2608 (SHM) (DKV), 2013 WL 11090763, at *8 (W.D. Tenn. Feb. 27, 2013) (same); Isilon Sys., Inc. v. Twin City Fire Ins. Co., No. C10-1392MJP, 2012 WL 503852, at *3 (W.D. Wash. Feb. 15, 2012) (same); U.S. Fire Ins. Co. v. Bunge N. Am., Inc., 244 F.R.D. 638, 642 (D. Kan. 2007) (same); Country Life Ins. Co. v. St. Paul Surplus Lines Ins. Co., No. 03-1224, 2005 WL 3690565, at *10 (C.D. Ill. Jan. 31, 2005) (same); Great Lakes Dredge & Dock Co. v. Commercial Union Assurance Co., 159 F.R.D. 502, 504 (N.D. Ill. Jan. 31, 1995) (same); Stonewall Ins. Co. v. Nat'l Gypsum Co., No. 86 CIV. 9671 (SWK), 1988 WL 96159, at *5 (S.D.N.Y. Sept. 6, 1988) (decided under former Rule 26(b)(2)).

LMI cite two cases, both from outside this Circuit, in which courts have denied demands for reinsurance agreements. See LMI 4/7/16 Mem. at 1 (citing Cummins, Inc. v. Ace Am. Ins. Co., No. 1:09-CV-738-JMS-DML, 2011 WL 130158 (S.D. Ind. Jan. 14, 2011), and Catholic Mut. Relief Soc. v. Superior Court, 42 Cal. 4th 358 (2007)). The Court finds neither of these cases persuasive. First, the Cummins decision did not hold that reinsurance agreements fall outside the scope of Rule 26(a)(1)(A)(iv); rather, the court found, under the facts of that case, that "the burden of producing the contracts" outweighed the benefit of their production. See Cummins, 2011 WL 130158, at *11. Second, the Cummins court cited no case law to support its conclusion that considerations such as "sensitive business matters" and relevancy trump the mandate of Rule 26(a)(1)(A)(iv). See Cummins, 2011 WL 130158, at *11. In fact, as various courts have recognized, including within this district, the relevance of

34

the documents to the subject matter of the litigation is not the test for discoverability under Rule 26(a)(A)(iv): "The rule is absolute . . . and does not require any showing of relevance." Suffolk Fed. Credit Union, 270 F.R.D. at 142 (citing U.S. Fire Ins., 244 F.R.D. at 641); accord Isilon Sys., 2012 WL 503852, at *3.

As for Catholic Mutual, that case turned entirely on California statutes and procedural rules. See Catholic Mut. Relief Soc., 42 Cal. 4th at 367-73. Indeed, in reaching its conclusion that reinsurance agreements need not be produced pursuant to California's civil discovery law, the Catholic Mutual court relied heavily on the provision's state legislative history, see id. at 371-72, and, on that basis, distinguished the long line of federal cases requiring disclosure under Rule 26 of the FRCP, see 42 Cal. 4th at 369 n.8 ("Federal discovery law neither controls the matter before us nor undermines our analysis of the history and legislative intent behind [the California provision].").

Therefore, LMI's reliance on these two cases is unavailing.

### B.      Rule 26(a)(1)(A)(iv)'s Language and Policy

In addition to case law, the Court concludes that the plain language and policy of Rule 26(a)(1)(A)(iv) support the conclusion that reinsurance agreements fall within its contours.

As a preliminary matter, the Court acknowledges that reinsurance cannot be treated interchangeably with insurance in every context and notes the cases cited by LMI for that general concept. See LMI 4/7/16 Mot. at 1. Indeed, even the term "reinsurance" can invoke different meanings. See, e.g., Declaration of Andrew J. Gregory (Apr. 7, 2016) ("Gregory Decl.") ¶¶ 12-20, DE #345-6.

Nevertheless, the Court finds it appropriate to construe "reinsurance" as the functional equivalent of "insurance" with respect to initial disclosures. First, the language of Rule 26(a)(1)(A)(iv) is broad, referring to "*any* insurance agreement" under which:

> an insurance business *may be liable* to satisfy all or part of a possible judgment in the action or *to indemnify or reimburse for payments made to satisfy the judgment*.

Fed. R. Civ. P. 26(a)(1)(A)(iv) (emphasis added). Thus, for Rule 26 purposes, whether or not a reinsurance agreement creates privity between an insured and the reinsurer, see LMI 4/7/16 Mot. at 4, is beside the point; what matters is whether the reinsurance agreement requires the reinsurer to "indemnify or reimburse for payments made to satisfy" a possible judgment in the action, see Fed. R. Civ. P. 26(a)(1)(A); see also Fed. R. Civ. P. 26(b)(2) advisory committee's note to 1970 amendment ("It is immaterial whether the liability is to satisfy the judgment directly or merely *to indemnify or reimburse another after he pays the judgment*.") (emphasis added).[28] Reinsurance agreements clearly fall within the scope of this definition. See U.S. Fire Ins., 244 F.R.D. at 642; cf. Gregory Decl. ¶ 9 (noting that all of the reinsurance agreements entered into by Stronghold Insurance Company Limited are "indemnity" agreements).

Moreover, the formulation of Rule 26(a)(1)(A)(iv) was driven by policy concerns about "realistic appraisal[s]" of settlements and the need for transparency — both of which are

---

[28] Although LMI's complaint in this case seeks relief only in the form of a declaratory judgment, Amtrak's counterclaims, cross-claims, and third-party claims seek monetary damages, thereby implicating the policy concerns of Rule 26(a)(1)(A)(iv). See generally *infra* pp. 40-41.

promoted by the production of reinsurance agreements. Fed. R. Civ. P. 26(b)(2) advisory

committee's note to 1970 amendment (disclosure of insurance agreements would "enable

counsel for both sides to make the same realistic appraisal of the case, so that settlement and

litigation strategy are based on knowledge and not speculation"). To be sure, LMI emphasize

that insurers typically do not have access to reinsurance information and that reinsurers

ordinarily do not control the litigation. See LMI 4/7/16 Mot. at 3-4.[29] Therefore, LMI

assert, reinsurance cannot affect an insurer's willingness or obligation to settle. See id. at

3-4. This argument ignores the fact that the availability of reinsurance might very well affect

an *insured*'s willingness to settle, especially where a direct insurer's solvency may be an

issue.

Similarly, the Court rejects LMI's claim that settlement-related considerations do not

apply in the reinsurance context "because the amount of the insurer's potential liability is set

by policy limits, not by the availability of insurance." LMI 4/25/16 Reply at 1. While policy

limits matter, so does the solvency of an insurer. LMI acknowledge the significance of

insurer solvency, see id., but argue that an insured does not need "access to reinsurance

agreements to weigh insurer solvency[,]" see LMI 4/7/16 Mot. at 3. In this connection, LMI

note that in certain jurisdictions, including the United States and the United Kingdom,

---

[29] In asking the Court to exclude reinsurance from the definition of "insurance agreements," LMI note that "[g]enerally, reinsurers do not have the right or ability to control the defense of the insurer when a claim is disputed." LMI 4/7/16 Mot. at 2 (citing Unigard Sec. Ins. Co. v. N. River Ins. Co., 79 N.Y.2d 576, 582 (1992)). But this point is undermined by the fact that, as LMI concede, claims control for a number of Policies in this action rests with a reinsurer. See LMI 4/7/16 Mot. at 3 n.9.

"insurers must demonstrate to regulators that they are solvent such that their assets (including reinsurance) suffice to pay claims." Id.

As part of their evidentiary submissions in support of their motion, LMI include a declaration by Richard John Spiller, who opines on the regulatory framework applicable to certain insurers in this matter. See Declaration of Richard John Spiller, DE #345-7. Notably, Spiller generalizes in his observations but acknowledges that he has not undertaken any investigation into the solvency of the particular insurers in the instant action. See id. ¶ 6. More importantly, the regulatory framework described by Spiller, no matter what safeguards are intended, do not necessarily guarantee compliance with them. See, e.g., id. ¶ 19 (noting that insurers subject to certain regulations that do "not meet the [minimum capital requirement] or [solvency capital requirement] [are] *likely* to be subject to a high degree of *supervision* by the relevant [] supervisory authority.") (emphasis added); id. ¶¶ 21-23 (discussing an insurer's obligation to self-report "key" information, including non-compliance with capital requirements). In any event, it should not be the Court's function to analyze the solvency of insurers in determining the discoverability of reinsurance agreements.

Thus, the Court finds LMI's arguments and submissions with respect to solvency less than persuasive.

C.     **Undue Burden**

LMI further complain that it would be "unduly burdensome" to produce the reinsurance agreements in this action, which they contend might number close to 1,000 separate reinsurance agreements. See LMI 4/7/16 Mot. at 4. But as Amtrak notes in its

opposition, one entity would not be expected to produce all 1,000 documents,[30] and, in

reality, the number of reinsurance agreements per insurer is much smaller. See Amtrak

4/18/16 Opp. at 5; see Declaration of Joseph L. Ruby in Support of [LMI's] Motion for a

Protective Order (Apr. 7, 2016) ¶¶ 6-7, DE #354-1 (extrapolating "as many as 1,000

reinsurance agreements" by assuming each company would produce 17 agreements each).[31]

Moreover, to the extent that LMI also object on the basis that the reinsurance agreements

include "sensitive business matters," see LMI 4/7/16 Mot. at 4, the Court is prepared to order

their production for attorneys' eyes only, see Country Life Ins., 2005 WL 3690565, at *10;

see also U.S. Fire Ins., 244 F.R.D. at 642.

---

[30] The number of insurers participating in the Policies at issue has been variously described as 96 or 150. See, e.g., Amtrak 4/18/16 Mot. at 5; LMI 4/25/16 Reply at 3.

[31] In response to LMI's assertion of undue burden, Amtrak, in its opposition, cites the "good cause" standard under Rule 26(c), see Amtrak 4/18/16 Opp. at 4, pursuant to which a court may, for "good cause," enter a protective order against "disclosure or discovery," in order to prevent "annoyance, embarrassment, oppression or undue burden or expense." Fed. R. Civ. P. 26(c)(1)(A). On reply, LMI resist application of the Rule 26(c) "good cause" standard and suggest, inter alia, that Rule 37(a)(3)(A), which governs motions to compel, provides the more appropriate standard. See LMI 4/25/16 Reply at 1 n.2. However, Rule 37(a)(3)(A) incorporates Rule 26(c) as the standard that governs protective orders relating to initial disclosures. See Fed. R. Civ. P. 37(a)(5)(B) (if a motion under Rule 37(a)(3)(A) is denied in whole or part, a court may issue a protective order under Rule 26(c)); see also King v. City of New York, No. 12-CV-2344 (NGG) (RER), 2014 WL 4954621, at *6 (E.D.N.Y. Sept. 30, 2014) (holding that, pursuant to Rule 26(c)(1)(A), "upon a showing of 'good cause,'" a court's "power to issue a protective order applies to initial disclosures as well as subsequent discovery requests").

Even assuming arguendo that the good cause standard of Rule 26(c) does not govern here, then, at a minimum, LMI would have to show that "the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). Under either standard, LMI have failed to establish that requiring the disclosure of reinsurance agreements would constitute an undue burden.

**D.    Application in the Instant Matter**

LMI argue that, if the Court is inclined to rule that reinsurance agreements are subject to initial disclosure requirements, they should not be ordered to produce the agreements in this case because Amtrak's monetary damages claims are vague and apply only to policies up to $25 million.  See LMI 4/7/16 Mot. at 5 (noting that Amtrak and LMI also seek declaratory relief, for which there will be no "judgment" that will require reimbursement or indemnification).  Amtrak counters that because LMI concede that it is impossible "to determine at this time which reinsurance policies apply," all of the reinsurance policies are relevant.  See Amtrak 4/18/16 Opp. at 3 n.9.  Notably, Amtrak does not specifically dispute LMI's contention that Amtrak is seeking monetary damages only on policies with limits up to $25 million,[32] but instead argues that the mandate of Rule 26(a)(1)(A)(iv) "do[es] not depend on the scope or amount of indemnification."  Id. (citing Great Lakes, 159 F.R.D. at 504).

The Court finds it appropriate to limit the production of reinsurance agreements to those relating to policies for which Amtrak is seeking monetary damages, as that comports with the Rule's focus on the "satisf[action]" of "judgments."  See Fed. R. Civ. P. 26(a)(1)(A)(iv).  With respect to LMI's contention that they are unable at this time to ascertain which of those policies would ultimately be required to pay a portion of any judgment in favor of Amtrak, the Court concludes it would be premature to limit Rule 26(a)(1)(A) disclosures simply because certain facts have yet to be determined.  See Hartman v. Am. Red Cross, No. 09-1302, 2010 WL 1882002, at *2 (C.D. Ill. May 11, 2010) ("At this stage of the lawsuit,

---

[32]  See Amtrak Am. Ans. ¶¶ 134, 142, 171, DE #277; Third-Party Compl. ¶¶ 38, 46, 58.

defense counsel's valuation of the case, based on 'facts' that have not yet been established, is just not enough to negate the Rule's obligation to produce the insurance agreement.").

## CONCLUSION

For the reasons explained above, this Court grants in part and denies in part Amtrak's motion to compel. In particular, the Court:

- denies Amtrak's request for communications with reinsurers;

- concludes that, although Continental failed to establish its entitlement to work product protection, Continental need not produce documents No. 15 through No. 41, as Continental alleges No. 15 through No. 40 are protected by the attorney-client privilege, which Amtrak does not challenge, and No. 41 relates to settlement communications, a dispute that the parties expect to resolve informally;

- concludes that the AIG Companies failed to establish their entitlement to work product protection and must produce the disputed documents, unless there are other privileges presently asserted with respect thereto;

- denies Amtrak's motion to compel "work product" documents on Nationwide/Wausau's log;

- grants in part and denies in part Amtrak's motion to compel underwriting, claims and document destruction/retention manuals;

- clarifies its prior ruling with respect to regulatory filings and holds that the temporal scope of the production should correspond to the period (up through October 1986) during which the Insurers were communicating with regulators about provisions in Amtrak Policies that were then in effect or thereafter issued;

- denies without prejudice Amtrak's motion to compel with respect to confidential settlement communications and leader-only discovery; and

- denies Amtrak's request for attorney's fees and costs.

In addition, the Court denies in substantial part the Insurers' request for a protective order and requires the Insurers to produce reinsurance agreements that relate to policies for which Amtrak is seeking monetary damages.

All productions required by this Memorandum and Order should be made no later than June 6, 2016.

        **SO ORDERED.**

**Dated:**      **Brooklyn, New York**
             **May 16, 2016**

             /s/ *Roanne L. Mann*
             **ROANNE L. MANN**
             **CHIEF UNITED STATES MAGISTRATE JUDGE**