**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
**CERTAIN UNDERWRITERS at LLOYD'S,**
**et al.,**

                          **Plaintiffs,**            **MEMORANDUM**
                                                          **AND ORDER**
      -against-

                                                            **14-CV-4717 (FB)**
**NATIONAL RAILROAD PASSENGER**
**CORPORATION, et al.,**

                          **Defendants.**
-------------------------------------------------------------x

**ROANNE L. MANN, CHIEF UNITED STATES MAGISTRATE JUDGE:**

In this declaratory judgment action, plaintiff-insurers seek, *inter alia*, a determination as to whether a series of liability insurance policies, issued to defendant National Railroad Passenger Corporation ("Amtrak") more than three decades ago, obligate the plaintiff-insurers to reimburse Amtrak for costs incurred in connection with environmental waste allegedly found on Amtrak's property. See Amended Complaint (Nov. 11, 2014) ("Am. Compl.") ¶¶ 1-2, Electronic Case Filing Docket Entry ("DE") #111; Amtrak Amended Answer, Counterclaims & Cross-Claims (Dec. 30, 2015), DE #277.

Currently pending before the Court is Amtrak's motion to compel discovery from each plaintiff.[1] Amtrak complains that LMI have produced documents from only the files of the lead underwriters on the policies (i.e., so-called "leader-only" discovery). See [Amtrak's]

---

[1] Plaintiffs are collectively referred to in this action and opinion as the London Market Insurers ("LMI"). Notably, not all insurers who participated in the policies at issue are plaintiffs; indeed, some have been named as defendants, see Am. Compl. ¶ 5, and additional insurers have been named as third-party defendants, see generally [Corrected] Third-Party Complaint (Mar. 23, 2016), DE #334; see also Am. Compl. ¶ 2; id. Attachment A, DE #111 at 38-40.

Motion for Discovery Regarding Leader-Only Discovery (Nov. 1, 2016) ("Amtrak Mot."), DE #469. Amtrak first raised its objections to this limitation at a conference held on January 29, 2016. See Transcript of Hearing held on January 29, 2016 at 114-54, DE #309. In a joint status report filed on April 12, 2016, the parties advised that they "were continuing to attempt to resolve their dispute over 'leader-only' discovery." Joint Status Report (Apr. 12, 2016) at 5, DE #354. By letter-motion dated November 1, 2016, Amtrak seeks to compel the production of each plaintiff's underwriting and claims files for the policies at issue. See Amtrak Mot. at 1.

## BACKGROUND

Plaintiffs in this action are insurers who "did business in the London Insurance Market and who issued or participated in — that is, subscribed to an agreed percentage share of the risk of —" one or more liability insurance policies issued to Amtrak during the period beginning on or about June 1, 1972 and ending in 1986 (the "Policies"). See Am. Compl. ¶¶ 1-2. According to the Amended Complaint, due to certain environmental contaminations and/or asbestos exposure, Amtrak demanded coverage under the Policies. See id. ¶¶ 7-8. In or around 2014, after many years of settlement discussions, this action was initiated. See id. ¶¶ 9-11.

In opposing Amtrak's motion to compel, LMI submitted a series of declarations from knowledgeable individuals detailing how the London Insurance Market has operated, and the searches that were conducted in response to Amtrak's document demands. Amtrak takes issue with the inferences to be drawn from the facts adduced, but, for the most part, does not dispute the facts alleged in those sworn statements.

I.      **The London Market**

During the time the Amtrak Policies were in effect, underwriters at Lloyd's were individuals who wrote insurance through unincorporated associations known as syndicates, which were managed by companies known as managing agents. See Declaration of Sharon Taylor dated November 10, 2016 ("Taylor Decl.") ¶ 12, DE #482-20. Entities that wished to obtain insurance from underwriters at Lloyd's were required to act through an authorized broker (known as "Lloyd's broker" or "London broker")[2]; the broker, acting on behalf of the prospective insured, prepared a "placing slip" summarizing the terms, conditions and limits of the insurance, and approached an underwriter, either for a syndicate at Lloyd's or for a London Market company, and proposed that the syndicate or company agree to participate in the described insurance policy. See Taylor Decl. ¶¶ 15-16; Wilson Decl. ¶¶ 17-18.

Each policy generally had a "lead underwriter," for either a syndicate or a company, who negotiated with the broker over the terms of the policy and, if there was an agreement, made a commitment to provide the insurance by "scratching" the slip, which showed the company name or syndicate number, the date, the percentage of the risk to be taken, and the underwriter's initials. See Taylor Decl. ¶¶ 14, 16; Wilson Decl. ¶¶ 18, 19. The syndicate or company whose underwriter negotiated the terms with the broker and first scratched the slip was known as the "slip lead" or "overall lead." See Wilson Decl. ¶ 20. The first syndicate to scratch a slip was known as the "syndicate lead" or "lead syndicate," and the first company to

---

[2] In the case of North American insureds, an American company, acting as the "retail broker," would, directly or through a wholesale broker, retain on the insured's behalf a London broker to place the insurance with Lloyd's syndicates and London companies. See Declaration of Peter Stringer Wilson dated November 8, 2016 ("Wilson Decl.") ¶ 17, DE #482-21.

scratch a slip was known as the "company lead." See Taylor Decl. ¶ 20; Wilson Decl. ¶ 22. The broker would then walk the slip around the market, approaching other underwriters for Lloyd's syndicates and for London Market companies in an effort to obtain a full 100 percent subscription. See Taylor Decl. ¶ 16; Wilson Decl. ¶ 20. Underwriters who scratched the slip for their syndicates or companies after the lead were known as the "following market." See Wilson Decl. ¶ 20. Once the slip was fully subscribed, the broker prepared a policy based on the terms recorded on the slip. See Taylor Decl. ¶ 18; Wilson Decl. ¶ 28. The policy was reviewed, stamped, and issued to the broker in multiple copies by a Lloyd's department called the London Policy Signing Office ("LPSO") . See Taylor Decl. ¶ 18; Wilson Decl. ¶ 28. The LPSO-issued policy was for syndicates only. See Taylor Decl. ¶ 18. A separate policy, or multiple policies, were issued for the company subscribers. See id. It was the responsibility of the London broker to deliver a copy of each policy to the insured and its U.S. broker, and to retain a copy for the broker's own files. See Wilson Decl. ¶ 30; see also Taylor Decl. ¶ 19.

The lead underwriter ordinarily would not retain copies of the documents it was shown by the broker; rather, the "placing" file was held by the broker. See Wilson Decl. ¶¶ 30-31; Taylor Decl. ¶ 17. Following market insurers typically retained "little to no documentation of the information presented by the broker, and no documents that would not also be in the records of the Lead Underwriter." Wilson Decl. ¶ 21; see id. ¶ 31; Taylor Decl. ¶ 17 (following market was even less likely than overall lead to retain copies of documents in the placing file). The LPSO did not issue copies of policies to the syndicates, and it did not retain

a copy for itself.³  See Taylor Decl. ¶ 19.

With respect to claims made under a policy placed through a London broker, it was the usual custom and practice for the insured to notify the London broker of a claim or potential claim; the broker in turn notified the claims department of the lead underwriter and, once agreement had been reached between the broker and overall lead, the broker would approach each of the following syndicates and companies to obtain their approval.  See Wilson Decl. ¶ 34; Taylor Decl. ¶ 21.  The policy could, however, provide for an alternative procedure for the handling of claims; indeed, the Amtrak Policies designated a U.S. law firm, Lord Bissell and Brook ("LBB"), to investigate claims and communicate with subscribing syndicates and companies once notified by the U.S. broker of a claim or potential claim.  See Wilson Decl. ¶ 35; Taylor Decl. ¶ 21.

The custom and practice in the London Market was for basic underwriting records and claims records to be held by the London broker.⁴  See Wilson Decl. ¶ 37.  Therefore, any materials maintained by individual syndicates or companies would be duplicative of the underwriting, claims and policy materials typically held by the broker.  See id.

The Amtrak Policies provide "excess" insurance and, as such, do not require the insurer to provide the insured with a defense to claims made against it; consequently, the

---

³ Syndicates had limited space in the Lloyd's underwriting room and did not have the capacity to maintain extensive files.  See Taylor Decl. ¶ 26.

⁴ It is unclear from the declarations submitted whether, for the period that LBB was designated to investigate Amtrak's claims, the London broker followed the regular custom and practice of holding claims records.  Nevertheless, the record contains other documents suggesting that LBB would provide the London broker with reports regarding LBB's investigation of claims. See, e.g., Letter to Interested Underwriters from Lord, Bissell & Brook (bates-stamped INS 1714), DE #515-5 at 55.

following market insurers would monitor developments but not intervene unless asked to approve settlements or other transactions that required payment. See Taylor Decl. ¶¶ 22-23. Although every subscriber had the right to review claims information, it was the practice in the London Market for the lead underwriter, which typically had accepted the largest percentage of risk, to undertake the responsibility to review claims. See Taylor Decl. ¶ 24; Wilson Decl. ¶¶ 23, 34. Following market subscribers, which tended to have relatively small shares of the policy, generally accepted the decisions of the lead underwriter. See Wilson Decl. ¶ 34; Taylor Decl. ¶ 24. Where, as here, the claims are "long-tail" ones, involving long settlement periods after the expiration of the policies, lead and following market subscribers typically relied on attorney reports, which summarized claim information. See Taylor Decl. ¶ 25.

Due to the large number of London insurers subscribing to the Amtrak Policies, particular insurers (including plaintiff Unionamerica Insurance Company Limited) with larger stakes in the Amtrak program were assigned to be leads in managing the conduct of the litigation on behalf of the London Market companies or syndicates. See Declaration of Martin James Watson dated November 4, 2016 ("Watson Decl.") ¶¶ 7, 8, DE #482-22; Declaration of Gerard Dupre dated November 10, 2016 ("Dupre Decl.") ¶ 27, DE #482-18. The use of such "assigned leads" to manage complex claims and litigation remains common practice in the London Market. See Watson Decl. ¶ 7.

## II. Document Retention and LMI's Document Searches

In 1994, claims handling on behalf of Lloyd's syndicates, for asbestos, pollution and health hazard claims arising in North America ("APH claims"), began to be centralized in a unit of Lloyd's called the Specialist Claims Unit ("SCU"). See Taylor Decl. ¶¶ 27, 28. In

1996, Equitas Limited took over the claims handling and reinsured the pre-1992 business of the syndicates; the SCU became part of Equitas Limited and was renamed the Equitas Claims Unit ("ECU"). See id. ¶ 29. All managing agents of the syndicates transferred the syndicates' claims files to the ECU, and transferred to Equitas the syndicates' prior business records through 1992, including underwriting records. See id. In 2007, in connection with another reinsurance transaction, the claims division of Equitas was transferred to Resolute Management Services Limited ("RMSL"), along with the syndicates' records. See id. ¶ 30. More than 162,000 boxes of syndicate records are stored in the archives of RMSL. See id. ¶ 31.

At the time of the 2007 transfer, APH claims information was stored in a London Market Claims Service database. See id. ¶ 33. Over time, that information was transferred to the so-called "MAX system," which contains, or should contain, the records of every claim that was open at the time the SCU took over the handling of APH claims from the syndicates, as well as claims records of all claims that have been opened since then on matters relating to 1992 and prior Lloyd's business. See id. ¶ 33. A database called "LIDS" contains summary records of payments made to and from brokers from October 1983 on policies written since 1976. See id. ¶ 34.

In connection with discovery in this litigation, LMI has caused searches to be made of the ECU files and the syndicate records for all lead syndicates. See id. ¶¶ 29, 54(b). Using the name of the insured, LMI searched the MAX system, which encompasses the records of all Amtrak claims and not only the records of the lead syndicates. See id. ¶¶ 35, 54(a). LMI searched the LIDS system by policy number for documents relating to Amtrak policies in effect since 1976. See id. ¶¶ 36, 54(a). LMI searched the records of the 14 syndicates (which were

managed by ten managing agents) that were leads on one or more Policies. See id. ¶¶ 53(c), (d). LMI searched the underwriting cards that were created by the ten managing agents, for entries for Amtrak, National Railroad, and National Passenger, and produced the 13 underwriting cards relating to Amtrak policies. See id. ¶ 53(e). LMI examined the indexes for approximately 19,800 boxes associated with the ten managing agents and reviewed those boxes that might contain underwriting or claims records. See id. ¶¶ 53(f), 54(c). LMI produced claims documents relating to 41 Policies. See id. ¶ 54(c). In the course of those searches, LMI reviewed 143 boxes by hand, which required 99.5 hours of work. See id. ¶¶ 55-56.

As noted above, for a period of time, LBB investigated claims on the Amtrak policies and communicated its findings to the syndicates and company subscribers. See Wilson Decl. ¶ 35; Taylor Decl. ¶ 21. LBB's files, which were transferred to Lewis Baach PLLC (counsel to LMI) in October 2004, contained correspondence to and from Amtrak or its counsel, correspondence to or from Amtrak's brokers, attorney-client correspondence and attorney reports. See Declaration of Aisha E.R. Bembry dated November 10, 2016 ("Bembry Decl.") ¶ 13, DE #482-16. LMI produced non-privileged documents from LBB's files. See id. ¶ 14.

As discussed below, LMI also produced documents from the files of H.S. Weavers (Underwriting) Agencies, Ltd ("Weavers"), which was the company lead on 27 Policies. See *infra* p. 16.

## III. The Parties' Arguments

Amtrak contends that it needs discovery from each plaintiff in order to contest LMI's defenses that Amtrak provided late notice, took action without LMI's knowledge or consent,

and failed to keep LMI informed about key developments. See Amtrak Mot. at 1. Amtrak seeks discovery from the following market because, it maintains, the overall lead on 35 of the 57 Policies at issue is not a party to this action and their files have not been produced. See id. at 2. Moreover, according to Amtrak, the files of leads other than the overall leads are insufficient because the syndicate and company leads functioned as did any other insurer in the following market, which is to say they had no responsibilities. See id. With respect to claims handling, Amtrak contends that two of the three designated "assigned leads" since 2005 have also not produced files. See id.[5] Furthermore, Amtrak argues that LMI has admitted that each plaintiff "kept, or could have kept," claims and underwriting files. See id. at 1.

In opposition, LMI do not dispute the relevance of the documents sought. Rather, LMI contend that they have already produced files from "all leads, both policy and assigned." [LMI's] Response in Opposition (Nov. 10, 2016) ("LMI Opp.") at 1, DE #482. More specifically, LMI state that they have produced documents from the overall lead on 48 of 49 of the Policies; all syndicate leads; and all but three company leads.[6] See id. Weavers was the company lead on 27 Policies, and went out of business in 1990. Although Weavers was not an insurance company, it contracted with a group of insurers (the "Weavers stamps") to provide them with underwriting services. See id. at 2. LMI claim that those files have been retrieved

---

[5] The files of assigned lead Resolute Management, Inc. ("RMI") were subject to a different motion to compel filed by Amtrak, which was granted in a separate memorandum and order in a related proceeding. See Memorandum and Order in 16MC2778 (Nov. 23, 2016) ("11/23/16 M&O"), DE #13.

[6] It appears that the discrepancy in the total number of Policies (49 versus 57 Policies) is a function of the fact that Amtrak counts multi-year policies as multiple policies. See LMI Opp. at 1 n.4.

and produced through two of the Weaver stamp companies, St. Katherine's and Winterthur; those stamp companies produced their files, which were created and originally held by Weavers. See id. at 2 & n.9. Amtrak counters that it received only a fraction of Weavers' "extensive" files, see Reply in Support (Nov. 17, 2017) ("Amtrak Reply") at 2, DE #491 – an assertion controverted by LMI in their sur-reply and accompanying declarations, see Letter [] re Sur-Reply (Nov. 21, 2016) ("LMI's Sur-Reply") at 1-2, DE #498; Declaration of Martin James Watson dated November 18, 2016 ("11/18/16 Watson Decl.") ¶¶ 10, 11, DE #498-6; Declaration of Joseph L. Ruby dated Nov. 21, 2016 ("Ruby Decl.") ¶ 4, DE #500-1.

## DISCUSSION

Effective December 1, 2015, Rule 26 was amended to allow discovery of:

> [A]ny nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

Fed. R. Civ. P. 26(b)(1). Prior to the recent amendments, the relevance provision now embodied in Rule 26(b)(1) was qualified by Rule 26(b)(2)(C)(iii), which then provided that discovery was to be limited where "the burden or expense of the proposed discovery outweighs its likely benefit . . . ." See Fed. R. Civ. P. 26(b)(2)(C)(iii) (amended 2015). The amendment, which "merely relocated the limitation from Rule 26(b)(2)(C)(iii) to Rule 26(b)(1)[,]" Vaigasi v. Solow Mgmt. Corp., No. 11 Civ. 5088 (RMB)(HBP), 2016 WL 616386, at *13 (S.D.N.Y. Feb. 16, 2016), was "intended to encourage judges to be more aggressive in identifying and discouraging discovery overuse by emphasizing the need to

analyze proportionality before ordering production of relevant information." Henry v. Morgan's Hotel Grp., Inc., No. 15-cv-1789 (ER)(JLC), 2016 WL 303114, at *3 (S.D.N.Y. Jan. 25, 2016) (internal quotation marks and citations omitted); accord Edebali v. Bankers Standard Ins. Co., No. CV 14-7095 (JS)(AKT), 2016 WL 4621077, at *1 (E.D.N.Y. Sept. 6, 2016); see Fed. R. Civ. P. 26(b) advisory committee's note to 2015 amendment ("referring to the need for continuing and close judicial involvement").  While the 2015 amendments made explicit the proportionality requirement, courts already had the discretion to limit discovery that is disproportionate to the needs of the case.  See Robertson v. People Magazine, No. 14 Civ. 6759 (PAC), 2015 WL 9077111, at *2 (S.D.N.Y. Dec. 16, 2015); see also EM Ltd. v. Republic of Argentina, 695 F.3d 201, 207 (2d Cir. 2012) ("Of course, as in all matters relating to discovery, the district court has broad discretion to limit discovery in a prudential and proportionate way."); Zubulake v. UBS Warburg LLC, 217 F.R.D. 309, 316 (S.D.N.Y. 2003) (discussing the "proportionality test" embodied in former Rule 26(b)(2)).

In determining proportionality, courts balance "the value of the requested discovery against the cost of its production." In re Weatherford Int'l Secs. Litig., No. 11 Civ. 1646, 2013 WL 2355451, at *5 (S.D.N.Y. May 28, 2013).  Moreover, as Rule 26(b)(2)(C) expressly provides, "the court must limit the frequency or extent of discovery otherwise allowed by these rules or by local rule if it determines . . . the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive . . . ." Fed. R. Civ. P. 26(b)(2)(C)(i); see In re Malev Hungarian Airlines, 964 F.2d 97, 102 (2d Cir. 1992) (noting that the court may limit discovery where the discovery sought is "obtainable from some other source that is more convenient, less

burdensome, or less expensive"); Bellinger v. Astrue, No. CV-06-321 (CBA), 2009 WL 2496476, at *4 n.4 (E.D.N.Y. Aug. 14, 2009) (holding that a request for disclosure should not be sustained where the information sought can be or has already been obtained through "some other source that is more convenient, less burdensome, or less expensive"); accord Denim Habit, LLC v. NJC Boston, LLC, 13-CV-6084 (ADS)(SIL), 2016 WL 2992124, at *5 (E.D.N.Y. May 23, 2016). Indeed, some courts within this District have required that "'the party seeking discovery [] make a *prima facie* showing that the discovery sought is more than merely a fishing expedition.'" Edebali, 2016 WL 4621077, at *1 (quoting Denim Habit, 2016 WL 2992124, at *3; Barbara v. MarineMax, Inc., No. 12-CV-368 (ARR)(RER), 2013 WL 1952308, at *2 (E.D.N.Y. May 10, 2013)); Sky Med. Supply Inc. v. SCS Support Claim Servs., Inc., No. CV 12-6383 (JFB)(AKT), 2016 WL 4703656, at *13 (E.D.N.Y. Sept. 7, 2016).

Rather than affirmatively establish a good faith basis to believe that non-duplicative documents are likely to be found in the files of the following market insurers, Amtrak essentially argues that LMI cannot avoid discovery on the grounds of inconvenience. See Amtrak Reply at 1. However, when the burden on the responding party outweighs the likelihood that non-duplicative responsive documents will be found, discovery may be deemed disproportionate, within the meaning of Rule 26(b)(1). Indeed, Amtrak's contention that Amtrak is entitled to production of the files of all plaintiffs, regardless of whether there are other sources of information that are more convenient, less burdensome and more likely to have responsive documents (see Amtrak Reply at 1), is contrary to the language of Rule 26 and

the authorities cited above.[7]

Amtrak's reliance on an unreported Supplemental Report and Recommendation in a case litigated in the Eastern District of Washington does not support Amtrak's demand for a search of all files of the following subscribers in the circumstances of the instant case. See Teck Metals, Ltd v. London Market Insurance, Supplemental Report and Recommendation Regarding Motion to Compel and Motion for Protective Order dated September 10, 2010, DE #469-1. In that case, the parties had agreed to limit discovery to "leaders' files" with respect to certain document requests and interrogatories, see id. at 1; the opinion does not describe which categories of document demands required searches of the files of the following market, nor does it include a proportionality analysis.

Like the magistrate judge in Teck Metals, this Court rejects any blanket prohibition on discovery from the files of the following market. By the same token – and as Amtrak itself concedes -- "leader-only discovery may be appropriate in some circumstances . . . ." Amtrak Mot. at 3 & n.12 (citing and purporting to distinguish Independent Petrochemical Corp. v. Aetna Casualty & Surety Group, Memorandum Opinion and Order filed on April 24, 1987 (D.D.C.), DE #469-2). In other words, in determining whether to order disclosure from the following market, the Court must undertake a fact-intensive inquiry that focuses on the nature

---

[7] In deciding to enforce Amtrak's subpoena *duces tecum* served on non-party RMI, this Court concluded that Amtrak had shown a need for the documents notwithstanding RMI's claim that its production would be duplicative of LMI's production and of that of RMI's other insurer clients. See 11/23/16 M&O at 10, 16-MC-2778. In contrast to the detailed evidence adduced on the instant motion, RMI's factual showing in that proceeding was conclusory and non-specific, leading the Court to conclude that Amtrak had raised substantial doubts about whether RMI possessed responsive documents that had not been produced in discovery by LMI and other insurers. See id. at 9-10.

and extent of the discovery produced from other sources and the asserted need for searches of the files of the following market, taking into account the operation of the London Insurance Market.[8]

In this case, LMI have shown, through a series of sworn statements, that the most likely entities to possess underwriting and claims handling documents are the London brokers, LBB, the assigned leads and the overall leads, and perhaps, to a lesser extent, the syndicate and company leads, see, e.g., Wilson Decl. ¶¶ 35-37; Watson Decl. ¶¶ 7-8; Dupre Decl. ¶ 20; the following market companies and syndicates typically retained little or no documentation of the information presented by the broker, no copies of policies, and no documents that would not be in the records of the overall lead, including underwriting, claim and policy records, see Wilson Decl. ¶¶ 21, 31, 36, 37; Dupre Decl. ¶ 20; Taylor Decl. ¶¶ 24, 26, 37, 47, 67. As discussed above, LMI have searched, among other things, the syndicate records for all lead syndicates, the above-described computer databases that contain the records of every claim that was open as of 1994 and claims records of all claims that have subsequently been opened for matters relating to 1992 and prior Lloyd's business, and have provided Amtrak with screen prints of the claims information found. See Taylor Decl. ¶¶ 33, 35. LMI produced 13 underwriting cards relating to Amtrak Policies that were created by the ten managing agents for lead syndicates. See id. ¶ 53(e). After searching the indexes of the managing agents' records, LMI produced copies of two slips relating to Amtrak Policies and some information relating to seven Policies. See id. ¶ 53(f). LMI did not find "any materials provided by

---

[8] The Court's ruling does not rest on the supposed impact on the London Market of any departure from "leader-only" discovery. See LMI Opp. at 3.

Amtrak, any analysis, any discussion of policy terms, notes or other specific underwriting materials." See id. ¶ 53(g). From the individual syndicate records, LMI located claims information relating to 41 Policies and produced the information, although "much of it [was] duplicative." See id. ¶ 54(c). In addition, Amtrak has received and/or will receive additional documents from the London brokers and each of the assigned leads. See Bembry Decl. ¶¶ 7-9; Ruby Decl. ¶ 9.

LMI have further shown that searching the archives of 77 following market syndicates and 46 following companies would be burdensome and highly unlikely to yield any non-duplicative responsive documents. See generally Independent Petrochemical, DE #469-2 (relying on five affidavits of London Market defendants in concluding that discovery sought from following market insurers would be duplicative of discovery produced by lead insurers). According to the estimate of Sharon Taylor, who serves as the discovery coordinator for materials stored in London on behalf of RMSL and its affiliates, which perform claims services for London Market companies and Lloyd's syndicates, see Taylor Decl. ¶¶ 6-8, there could be as many as 3,500 boxes (50 boxes per syndicate) to be searched for responsive documents from the following market syndicates, see id. ¶ 66.

Amtrak has not rebutted LMI's showing with any evidence that the following market insurers are likely to have any documents that have not been produced from the files of the overall leads or from other sources. Amtrak argues that the discovery sought is relevant to LMI's defenses that "Amtrak gave late notice, took actions without their knowledge or consent, [and] failed to keep them informed about key developments." See Amtrak Mot. at 1. Nevertheless, Amtrak does not contend that it (or its broker) had any direct communications

with the following market insurers about Amtrak's claims under the Policies, nor does it proffer any reason for the Court to conclude that the following market insurers possess documents that would not be found in the files of the overall leads.

In a challenge to the adequacy of LMI's production, Amtrak complains that Weavers, the overall lead for 34 Policies, went out of business and that its files therefore have not been produced. See Amtrak Mot. at 2 n.5. The latter part of this factual assertion is belied by the record. According to the sworn statements of Martin James Watson, a claims adjuster who acted on behalf of one of the Weavers stamp companies (St. Katherine's Insurance Company plc), after Weavers ceased doing business in 1990, Weavers' records passed to Randall & Quilter Investment Holdings plc ("R&Q"), which has maintained these records as Weavers created them. See Watson Decl. ¶¶ 10-12. In his capacity as St. Katherine's representative, Mr. Watson collected documents from R&Q's files of Weavers documents in response to Amtrak's discovery requests. See id. ¶ 14; see also Bembry Decl. ¶¶ 9, 12. Based on his personal experience with Weavers and familiarity with its records, Mr. Watson believes that the documents obtained from R&Q reflect the complete files kept by Weavers. See 11/18/16 Watson Decl. ¶¶ 4, 10-11. In addition, LMI provided Amtrak with Weavers documents that the Resolute-affiliated companies had archived with respect to Policies subscribed by the Winterthur companies, which were also Weaver stamp companies. See Taylor Decl. ¶¶ 59, 60; Bembry Decl. ¶ 12.[9] Therefore, even as to those Policies as to which Weavers was the

---

[9] Although Peter Wilson, who was the Chief Underwriter and Managing Director of Weavers when it ceased doing business in 1990, was unable to identify which entity currently possesses Weavers' files, he explained that in preparing for his deposition, he reviewed documents

(continued…)

overall lead, searching the files of the following market is unlikely to lead to the production of non-duplicative documents.

Nevertheless, LMI have conceded the appropriateness of "limited additional discovery to satisfy Amtrak's stated concerns . . . ." See LMI's Sur-Reply at 1; Joint Letter (Nov. 28, 2016) ("11/28/16 Joint Letter"), DE #508. In an effort to resolve this discovery dispute without motion practice, LMI had proposed to Amtrak, among other things, that Amtrak select ten representative following market syndicates and companies to search for and produce underwriting and claim records in their files. See 11/28/16 Joint Letter at 1-2. The Court concludes that this is a reasonable resolution of the dispute, and will allow Amtrak to test its theory that the files of the following market insurers contain non-duplicative documents. Therefore, Amtrak must select, by December 1, 2016, ten following market syndicates and/or companies that subscribed to Amtrak Policies, and plaintiffs must produce, by December 8, 2016, non-privileged underwriting and claims files from those syndicates or companies.

---

[9](…continued)
produced in this case bearing LMI bates stamp numbers and recognized them as documents created or retained by Weavers, leading him to conclude that they had been produced by one or more of the Weaver stamp companies that are parties to this action. See Wilson Decl. ¶ 39.

## CONCLUSION

For the reasons explained above, this Court grants in limited part and otherwise denies Amtrak's motion to compel.

Any objections to the Memorandum and Order must be filed with the Honorable Frederic Block by December 14, 2016, or will be deemed waived. The filing of any objection will not automatically stay this Court's order of production.

**SO ORDERED.**

**Dated:  Brooklyn, New York**
**November 30, 2016**

/s/  *Roanne L. Mann*
**ROANNE L. MANN**
**CHIEF UNITED STATES MAGISTRATE JUDGE**