UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------x
CERTAIN UNDERWRITERS AT
LLOYD'S, LONDON; ACCIDENT &
CASUALTY CO.; ACCIDENT
& CASUALTY INSURANCE
COMPANY OF WINTERTHUR;
ACCIDENT & CASUALTY
INSURANCE COMPANY OF
WINTERTHUR (NO. 2A/C);
ACCIDENT & CASUALTY
INSURANCE COMPANY OF
WINTERTHUR (NO. 3 A/C);
AEGON NV FORMERLY AGO
SCHADEVEZEKERING
MAATSCHAPPIJ NV; AG DE 1830
COMPAGNIE BELGE
D'ASSURANCES GENERALES
INCENDIE ACCIDENTS ET
RISQUES DIVERS SA; AMERICAN
HOME INSURANCE COMPANY;
AMSTERDAM - LONDON
VERZEKERING MAATSCHAPPIJ
NV; ANCON INSURANCE
COMPANY (UK) LIMITED;
ARGONAUT NORTHWEST
INSURANCE COMPANY;
ASSICURAZIONI GENERALI SPA
(UK BRANCH); BISHOPSGATE
INSURANCE COMPANY LIMITED;
BRITAMCO POOL; CNA
REINSURANCE COMPANY; CNA
REINSURANCE COMPANY
LIMITED; CORNHILL INSURANCE
COMPANY LIMITED; CREDIT DE
NAMUR; DELTA-LLOYD NON-LIFE
INSURANCE COMPANY LIMITED;

**MEMORANDUM AND ORDER**
Case No. 14-CV-4717-FB-RLM

DELTA-LLOYD SCHADEVER-
ZEKERING NV; DILIGENTIA;
EUROPEESCHE VERZEKERING
MAATSCHAPPIJ NV; EXCESS
INSURANCE COMPANY LIMITED;
GRESHAM FIRE & ACCIDENT
INSURANCE SOCIETY LIMITED;
GRESHAM INSURANCE SOCIETY
LIMITED; HELVETIA-ACCIDENT
SWISS INSURANCE COMPANY (AS
PART OF GIBBON "E" GROUP);
HARPER INSURANCE LTD F/K/A/
TUREGUM INS CO.; INSTITUTO DE
REASSEGUROS DO BRASIL (IRG) -
LONDON BRANCH; INTERLLOYD
VERZEKERING MAASTSCHAPPIJ
NV; KONING & BOEKE VAN 1819;
LA BELGIQUE; L'ASSICURAZIONI
D'ITALIA; LE ASSICURAZIONI
D'ITALIA SPA; LES ASSURANCES
GENERALES DE FRANCE; LES
PROPRIETAIRES REUNIS S.A. D.
ASSURANCES I.A.R.D.; L'ETOILE;
LONDON & EDINBURGH GENERAL
INSURANCE COMPANY, LONDON
AND EDINBURGH GENERAL
INSURANCE COMPANY LIMITED;
MAAS LLOYD NV SCHADEVER-
ZEKERINGSMAATSCHAPPIJ;
MERCATOR ALGEMENE VER-
ZEKERINGS MAATSCHAPPIJ NV;
N.V. ROTTERDAMSE ASSURAN-
TIEKAS, N.V. VERZ MIJ DE
NOODERN; NAMUR ASSURANCES
DU CREDIT; NATIONAL
CASUALTY COMPANY; NATIONAL
CASUALTY COMPANY OF
AMERICA LIMITED;

NISSAN FIRE & MARINE
INSURANCE COMPANY;
NOORHOLLAND BRANDW;
NORWICH UNION FIRE
INSURANCE SOCIETY LIMITED;
PROVIDENTIAL INSURANCE
COMPANY; RHEINLAND
VERSICHERUNGS AG; ROYAL
NEDERLAND SCHADEVER-
ZEKERING NV; ROYALE BELGE
SA;  ROYALE BELGE INCENDIE
REASSURANCE S.A.;  SIMCOE &
ERIE GENERAL INSURANCE
COMPANY; ST KATHERINE
INSURANCE COMPANY PLC;
TAISHO MARINE & FIRE
INSURANCE COMPANY LIMITED;
TERRA NOVA INSURANCE
COMPANY; THE SUMITOMO
MARINE AND FIRE INSURANCE
COMPANY LIMITED; UNION
AMERICA INSURANCE COMPANY
LIMITED; WINTERTHUR SWISS
INSURANCE COMPANY;
WURTTEMBERGISCH
FEUERVERSICHERRUNG AG;
YASUDA FIRE & MARINE
INSURANCE COMPANY (UK)
LIMITED,

        Plaintiffs,

   -against-

NATIONAL RAILROAD
PASSENGER CORPORATION;
ALLIANZ INSURANCE COMPANY;

ALLSTATE INSURANCE         COMPANY; AMERICAN HOME

ASSURANCE COMPANY;
AMERICAN INSURANCE
COMPANY; AMERICAN
REINSURANCE COMPANY;
ARGONAUT INSURANCE
COMPANY; ASSUBEL ACCIDENTS
ET DOMMAGES SA; ASTRA S.A.
INSURANCE AND REINSURANCE
COMPANY AS SUCCESSOR TO
ADAS STATE INSURANCE
INSTITUTE; ATLANTICA
INSURANCE COMPANY; BANCO
DE SEGUROS DEL ESTADO;
BANDEIRANTE; BELLEFONTE
INSURANCE COMPANY (US);
BISON INSURANCE COMPANY
LIMITED; BRITTANY INSURANCE
COMPANY LIMITED; CALIFORNIA
UNION INSURANCE COMPANY;
CIGNA; COMPAGNIE BELGE
D'ASSURANCES CREDIT S.A.;
COMPANHIA DE SEGUROS
IMPERIO; COMPANIA DE SEGUROS
LA REPUBLICA S.A.;
CONTINENTAL INSURANCE
COMPANY AS SUCCESSOR IN
INTEREST TO HARBOR
INSURANCE COMPANY AND
PACIFIC INSURANCE COMPANY;
THE DOMINION INSURANCE
COMPANY LIMITED; EURINCO
ALLGEMEINE VERSICHERUNGS
AKTIENGESELLSCHAFT;
EVANSTON INSURANCE
COMPANY; FIRST STATE
INSURANCE COMPANY;

FIREMAN'S FUND INSURANCE          COMPANY; GESB-GRUPO

EMPRESAS SEGURADORAS;
GRANITE STATE INSURANCE
COMPANY; THE HARTFORD
ACCIDENT AND INDEMNITY
COMPANY; HASSNEH INSURANCE
COMPANY OF ISRAEL LIMITED;
INSTITUTO NACIONALI DE
REASEGUROS; INSURANCE
COMPANY OF NORTH AMERICA;
INSURANCE COMPANY OF THE
STATE OF PENNSYLVANIA;
INTERSTATE REINSURANCE
CORPORATION; INTERNATIONAL
SURPLUS LINES INSURANCE
COMPANY; KOREAN
REINSURANCE COMPANY;
LANDMARK INSURANCE
COMPANY; LEXINGTON
INSURANCE COMPANY;
NATIONAL MUTUAL INSURANCE
COMPANY; NATIONAL UNION
FIRE INSURANCE COMPANY OF
PITTSBURGH, PENNSYLVANIA;
NORTHBROOK INSURANCE
COMPANY; THE PEOPLE'S
INSURANCE COMPANY OF CHINA;
RAILROAD ASSOCIATION
INSURANCE LIMITED;
REAFIANZADORA Y
REASEGURADORA DE AMERICA;
ROBERTO FEVRE; SHAND
MORAHAN & CO.; STRONGHOLD
INSURANCE COMPANY LIMITED;
VERA CRUZ INSURANCE
COMPANY; WAUSAU
INTERNATIONAL

UNDERWRITERS;                          YOSEMITE INSURANCE

COMPANY; and DOES 1-40,

                        Defendants.
-----------------------------------------------x

**BLOCK, Senior District Judge:**

This is a declaratory-judgment action seeking an adjudication of rights and obligations under various liability insurance policies. The policies were issued by the plaintiffs—referred to collectively as the "London Market Insurers" (or "the LMI") because they all participated in that unique marketplace—to the National Railroad Passenger Association—more commonly known as "Amtrak"—over a fourteen-year period. The caption, set forth in full above, attests to the case's complexity.

The LMI and Amtrak have moved for summary judgment. In keeping with their usual litigation strategy, both sides have raised a host of issues and have submitted extensive briefs in support of their respective positions. In keeping with its own continuing effort to keep the case within the bounds of human comprehension, the Court will dispense with the usual formalities of a memorandum and order; if ever there was a case warranting the omission of a full exposition of the factual background, procedural history and specification of issues, this is it. Instead, the Court will simply set forth its holding, and a brief summary of its reasoning, with respect to each issue raised.

## I. Choice of Law

What the parties originally presented as a major issue for the Court's consideration has reduced itself almost to an irrelevancy. They agree that the substantive law of the District of Columbia governs their dispute. They disagree, however, as to what the Court should do when the highest court of that jurisdiction, the District of Columbia Court of Appeals, has not spoken on a particular issue. The Court holds that New York choice-of-law rules apply, *see In re Gaston & Snow*, 243 F.3d 599, 607 (2d Cir. 2001) (federal court must apply forum state's choice-of-law rules "where no significant federal policy, calling for the imposition of a federal conflicts rule, exists"), and that "New York courts would, as a matter of substantive interpretation, presume that the unsettled common law of another state would resemble New York's but that they would examine the law of the other jurisdiction and that of other states, as well as their own, in making an ultimate determination as to the likely future content of the other jurisdiction's law." *Rogers v. Grimaldi*, 875 F.2d 994, 1003 (2d Cir. 1989).

## II. Coverage Agreement

The obligations of the LMI to Amtrak are defined, of course, by the language of the policies at issue. Although there are almost 200 such policies—many of them individually negotiated, "manuscript" policies—the basic insuring agreement is essentially the same across policies. Between 1972 and mid-

1974, the policies promised to

> indemnify the Assured for any and all sums which the Assured shall
> become liable to pay, and shall pay to any person or persons as
> compensation for . . . injury or damage to property (excluding
> property of the Assured) arising out of the operation of any passenger
> train by or for the account of the named insured and all services or
> operations incidental thereto during the period commencing
> [DATE/TIME] and ending [DATE/TIME] at the various places where
> the Assured's operations are conducted, including also all loss and
> legal expenses (excluding salaries of employees and office expenses)
> incurred in investigation, adjustment or litigation of claims made
> against the Assureds.

Decl. of Cathy Rawlings (Feb. 13, 2017), Ex. D.  Between mid-1974 and 1986,

they promised to

> indemnif[y] the Assured for any and all sums which the Assured shall
> become legally liable . . . to pay as compensation or damages for . . .
> injury or damage to property (excluding property of the Assured)
> arising out of any occurrence or occurrences caused by or growing out
> of the Assured's operations and/or any services or operations
> incidental thereto during the term hereof; and to indemnify the
> Assured for legal, investigation, and other expenses as set forth in the
> definition of Ultimate Net Loss.

*Id.*  "Ultimate Net Loss" is defined as

> the sum actually paid in cash in the settlement of losses for which the
> Assured is liable, after making deductions for all recoveries, all
> salvages and all collectible claims upon other insurances . . . including
> investigation and adjustment costs as well as including but not limited
> to medical or medically related costs, and legal costs incurred, other
> than the Assured's usual and ordinary fixed operating and office costs.

Decl. of Cathy Rawlings (Feb. 13, 2017), Ex. B (Allianz Underwriters, Inc. Excess
Liability Policy) at AMT_00000005.

According to the Court's interpretation of this language, entitlement to

indemnity is contingent on several things:

- There must be a liability, that is, a legal obligation to pay.

- The obligation must be to pay compensation for injury or damage to property .[1]

- The property must belong to someone other than Amtrak.

- The injury or damage must, for the 1972-1974 policies, arise out of the operation of a passenger train by or for the account of Amtrak, or out of a service or operation incidental to operation of a passenger train.  For the 1974-1986 policies, the injury or damage must arise out of an occurrence or occurrences caused by or growing out of Amtrak's operations, or any services or operations incidental to Amtrak's operations.

- The injury or damage must occur during the policy period.

These interpretations resolve several of the parties' disputes.

**A.  Loss**

The LMI argue that the Sunnyside Yard cleanup did not result in a "loss" to Amtrak because the cleanup improved the value of the property and was, accordingly, accounted for as a capital investment on Amtrak's books.  The Court concludes that Amtrak's accounting methodology is not relevant to coverage.

Indemnifying for a loss is, of course, the whole point of insurance.  But in the context of liability insurance, the relevant loss is understood as a legal obligation to pay a third party.  Consistent with that understanding, the 1972-1974

---

[1]The policies also cover personal injuries, but that is beyond the scope of this stage of the litigation.

9

policies promise indemnity "for any and all sums which the Assured shall become liable to pay, and shall pay . . . *including also* all loss and legal expenses (excluding salaries of employees and office expenses) incurred in investigation, adjustment or litigation of claims." Rawlings Decl., Ex. D (emphasis added). Similarly, the 1974-1986 policies promise indemnity for Amtrak's legal liability "*and* to indemnify the Assured for legal, investigation, and other expenses as set forth in the definition of Ultimate Net Loss." *Id.* (emphasis added). Thus, "loss" is relevant only as a certain type of expense that the insured may incur *in addition* to the sums paid as a result of its legal obligation to a third party. Liability for those sums does not depend on whether they appear as a "loss" on Amtrak's books.

## B. Compensation for Injury or Damage

The LMI argue that the environmental cleanup costs paid by Amtrak did not constitute "compensation for injury or damage." In *Independent Petrochemical Corp. v. Aetna Casualty & Surety Co.*, 944 F.2d 940 (D.C. Cir. 1991), the D.C. Circuit distinguished between environmental cleanup costs and fines:

> Liability for environmental response costs is similar to compensation placing an individual in the position that he would have been in had the injurious action not occurred. This is how "damages" is ordinarily understood. A fine or penalty, in contrast, is not understood to be dollar-for-dollar recompense. Rather, it is a pecuniary form of punishment for the commission of an act society finds repugnant and seeks to deter.

*Id.* at 947. It then held that "'damages' includes costs the insured is legally

obligated to pay to [governmental entities] as reimbursement for their activities in remedying environmental harm." *Id.* Although the circuit court was interpreting Missouri law, its interpretation was based on general principles of insurance law and accorded with the overwhelming majority of cases. *See id.* at 946 ("Our research reveals that, with [one exception], in every case in which the operative state's rules of insurance contract interpretation required . . . resort to the common and ordinary understanding of language, the word 'damages' has been construed to cover reimbursement for environmental response costs incurred by a government.").

The District of Columbia adheres to these general principles. *See Quadrangle Dev. Corp. v. Hartford Ins. Co.*, 645 A.2d 1074, 1075 (D.C. 1994). Moreover, the Maryland Court of Appeals, adopting the majority rule, has held that "environmental response costs fall within that definition [of 'damages']," *Bausch & Lomb, Inc. v. Utica Mut. Ins. Co.*, 625 A.2d 1021, 1033 (Md. 1993), and a D.C. court "commonly looks [to Maryland law] for guidance in the absence of its own precedents," *Athridge v. Aetna Cas. & Sur. Co.*, 351 F.3d 1166, 1171 (D.C. Cir. 2003). For these reasons, the Court is confident that the D.C. Court of Appeals would also follow the majority rule and conclude that "compensation for damage or injury" includes payment of environmental cleanup costs.

### C. Third-Party Property

11

The LMI concede that some pollutants at Sunnyside Yard migrated onto third-party property, but allege that the amount of damage represents only a small percentage of the total cleanup costs. Amtrak, for its part, acknowledges that the bulk of the cleanup was either to remediate groundwater contamination or to abate the risk of such contamination.

## 1. Groundwater Ownership

The Court agrees with the proposition, advanced by both the LMI and Amtrak, that the ownership of groundwater is a question of property law, not contract interpretation. As such, New York law governs that issue.

In *New York v. New York Central Mutual Fire Insurance Co.*, 542 N.Y.S.2d 402 (3d Dep't 1989), New York State sued a property owner's liability insurer to recover amounts paid to clean up an oil spill on the property. Invoking an "owned property" exclusion similar to the one in the policies in this case, the insured denied coverage because "the flow of fuel oil was halted before it migrated to a neighbor's property, where it threatened to contaminate a private drinking well." *Id.* at 403. The Third Department held that the exclusion did not apply:

> [W]hat was damaged here was not the insured's property, but rather property entrusted to plaintiff by its citizens. There is no question but that the fuel oil entered the groundwater, or at the very least threatened to, and since groundwater is a natural resource protected by plaintiff as trustee for its people, the oil spill caused damage to property other than that of the insured, thereby triggering defendant's obligation under its policy.

*Id.* at 403-04 (citing N.Y. Nav. L. §§ 170, 172; other citations omitted).

To be sure, there is a competing view that a government's protection of groundwater does not make it the owner of the resource. *See Bausch & Lomb, Inc.*, 625 A.2d at 1036 ("The State's interest in groundwater rests on its power to preserve and regulate. That power does not constitute a property interest within the contemplation of the insurance policy in dispute."). But one of New York's intermediate appellate courts has held that it does, and the Court is not persuaded that the New York Court of Appeals would reach a different result.

## 2. Abatement of Future Harm

While the ownership of property presented a question of New York law, the existence of coverage for future harm is a question of D.C. insurance law. Though there is no clear guidance from the D.C. Court of Appeals, there is a general consensus that costs incurred to prevent future harm are covered if the threat of such harm is imminent. In New York, for example, the First Department declined to apply *New York Central Mutual* where future harm was possible, but not immediate and ongoing:

> [T]he test for determining whether the exclusion applies must focus on the nexus between the condition of the insured's property and the existence of ongoing and immediate harm to the property of others. Where the harm cannot be cured without performing work on the insured's property, the exclusion is not applicable. On the other hand, in cases like this, where the immediate danger has been corrected, the restorative work to the insured's property will not be covered.

*Castle Village Owners Corp. v. Greater N.Y. Mut. Ins. Co.*, 878 N.Y.S.2d 311, 316

(1st Dep't 2009).  Maryland law is similar and, in addition, has the benefit of

language that can easily be presented to a jury:

> We conclude that, if [the insured's] property caused actual damage to
> property of another, and there was imminent risk of additional harm if
> preventative measures were not implemented, and the insured had a
> duty to remediate, then the Policy protects the insured for the fair and
> reasonable costs of necessary remedial measures, but only to the
> extent that the repairs were not merely to benefit the insured's
> property.

*Aetna Ins. Co. v. Aaron*, 685 A.2d 858, 862 (Md. Ct. Spec. App. 1996).

### D.  Arising out of Operations

Coverage under the 1972-1974 policies is limited to property damage

"arising out of the operation of any passenger train by or for the account of the

named insured. Rawlings Decl., Ex. D.  Coverage under the subsequent policies   is

limited to damage "arising out of any occurrence or occurrences caused by or

growing out of the Assured's operations."  *Id.*  The LMI argue that Amtrak did not

take over operations at Sunnyside Yard until it acquired the property in 1976.

From its inception in 1970, however, Amtrak was authorized to relieve a

railroad in financial straits "from and after May 1, 1971, of its entire responsibility

for the provision of intercity rail passenger service."  45 U.S.C. § 561(a)(1)

(repealed 1994).  Since it did not yet own the necessary infrastructure, Amtrak was

further authorized to "contract with railroads or with regional transportation

14

agencies for the use of tracks and other facilities and the provision of services on such terms and conditions as the parties may agree." *Id.* § 562(a) (repealed 1994).

Pursuant to these statutory authorizations, Amtrak and several bankrupt railroads—including the Penn Central Transportation Company, which owned Sunnyside Yard—executed the National Railroad Passenger Corporation Agreement of April 16, 1971. Under that agreement, "Amtrak undertook to assume the intercity rail passenger responsibilities of the Trustees of Penn Central and all other contracting railroads, and Penn Central undertook to render certain services to Amtrak and to maintain its rail lines used by Amtrak at an agreed upon 'level of utility.'" *National R.R. Passenger Corp. v. Blanchette*, 551 F.2d 127, 130 (7th Cir. 1977). The Court holds that, by virtue of the agreement, Penn Central's operation of passenger trains was at least "for the account of" Amtrak beginning in 1971, and that Amtrak was engaged in operations from at least that time.

The LMI object that the 1971 agreement does not specifically address the operation of Sunnyside Yard. But proof that Amtrak owned or operated any specific facility is not required. What is required is that the damage must arise out of a relevant operation: operation of a passenger train by Amtrak or for its account until mid-1974 and any Amtrak operation thereafter. Morever, the policies in both time periods cover "services or operations incidental to" those operations.

In sum, to obtain coverage under the 1972-1974 policies, Amtrak must prove

that the property damage arose out of the operation of any passenger train by it or for its account, *or* out of a service or operation incidental thereto. For the 1974-1986 policies it must show that the damage arose out of its operations, *or* out of a service or operation incidental thereto. The fact that Amtrak did not own or operate Sunnyside Yard until 1976 does not, as a matter of law, preclude it from carrying that burden.

### E. During the Policy Period

Finally, to obtain coverage under a particular policy, Amtrak must prove that the damage occurred while the policy was in effect. That simple phrasing masks the complexity that arises when the damage is not immediately apparent or accumulates over many years. Attempts to address that complexity have led to what one court has called a "bewildering plethora of authority." *Gottlieb v. Newark Ins. Co.*, 570 A.2d 443, 445 (N.J. App. Div. 1990).

The extensive caselaw on the subject distills two related questions to be answered: (1) Was a particular policy triggered? (2) If multiple policies were triggered, how should the total indemnity obligation be allocated?

#### 1. Trigger

As Judge Weinstein summarized, "Courts have adopted several different trigger theories. Principal among these are the exposure theory, the manifestation theory, the continuous or multiple trigger theory, and the injury in fact theory."

*Uniroyal, Inc. v. Home Ins. Co.*, 707 F. Supp. 1368, 1387 (E.D.N.Y. 1988). In

*Wrecking Corporation of American, Virginia, Inc. v. Insurance Company of North*

*America,* 574 A.2d 1348 (D.C. 1990), the D.C. Court of Appeals applied the

manifestation theory to liability coverage for property damage. *See id.* at 1350

("[T]he prevailing rule is that 'property damage occurs' at the time the damage is

discovered or when it has manifested itself."). It noted in dicta, however, that "a

limited exception exists where the damage can be characterized as being

'continuous or progressive.'" *Id.* The Court infers from this that the D.C. Court of

Appeals would, in a proper case, apply the continuous-trigger theory. *Accord*

*Young Women's Christian Ass'n v. Allstate Ins. Co.*, 275 F.3d 1145, 1155 (D.C.

Cir. 2002) ("District of Columbia law applies the continuous trigger where the

damage is of a continuous nature.").

The most succinct formulation of the continuous-trigger theory is found in

the New Jersey Supreme Court's opinion in *Owens-Illinois, Inc. v. United*

*Insurance Co.*, 650 A.2d 974 (N.J. 1994): "The conceptual underpinning of the

continuous-trigger theory, then, is that injury occurs during each phase of

environmental contamination-exposure, exposure in residence (defined as further

progression of injury even after exposure has ceased), and manifestation of

disease." *Id.* at 981. Although offered in connection with personal-injury liability,

the explanation was easily adapted to property-damage liability later in the

opinion: "[W]e hold that claims of asbestos-related property damage from installation through discovery or remediation (the injurious process) trigger the policies on the risk throughout that period." *Id.* at 984.

One important fact distinguishes this case from *Owens-Illinois*. The source of the injury in *Owens-Illinois*—asbestos-based building material—was undisputed. The limitation of coverage to third-party property was likewise not at issue because the insured was the manufacturer of the material, which was used on the property of others. Therefore, the New Jersey Supreme Court could sensibly conclude that, just as "some injury to body tissue occurs on the inhalation of asbestos fibers," 650 A.2d at 983, some injury to property began to occur when the asbestos was installed.

In this case, however, the beginning of the "injurious process" is a question of fact because both the cause of the contamination and its effect on third-party property are disputed. In other words, the jury will have to determine when (if ever) Amtrak's operations, as defined in Part II.D., first caused damage to third-party property, as defined in Part II.C. Only those policies in effect on or after that date will be triggered. *Accord Harleysville Mut. Ins. Co. v. Sussex County*, 831 F. Supp. 1111, 1124 (D. Del. 1993) ("Applying the continuous trigger theory to the facts of this case, the Court finds that there remain issues of fact relating to the start of the injurious process. That is, when did [contaminants] begin to migrate off the

County's property?").

## 2. Allocation

Assuming multiple policies are triggered, the question becomes how the total indemnity is to be apportioned across policies. Under the "all sums" or "joint and several" approach advocated by Amtrak, any triggered policy covers the full amount of the liability. Under the "pro rata" approach advocated by the LMI, each triggered policy covers only a pro rata share of the liability.

The "all sums" approach was endorsed by the D.C. Circuit in *Keene Corp. v. Insurance Co. of North America*, 667 F.2d 1034 (D.C. Cir. 1981): "The only logical resolution of this issue is for [the insured] to be able to collect from any insurer the full amount of indemnity that is due, subject only to the provisions in the policies that govern the allocation of liability when more than one policy covers an injury." *Id.* at 1050. Significantly, however, *Keene* did not purport to make or apply D.C. law. Rather, it identified six jurisdictions – Delaware, New York, D.C., Pennsylvania, Connecticut and Massachusetts– whose substantive law arguably applied, but concluded that it was unnecessary to reach "the issue of the applicable state law" because none of the six jurisdictions "gives us specific guidance in resolving this case, and the basic principles governing the interpretation of insurance policies are the same in each state." *Id.* at 1041 n.10.

In the years since *Keene* was decided, the "pro rata" approach has become the clear majority rule. Indeed, the New York Court of Appeals, contrary to the D.C. Circuit's prediction, rejected the "all sums" approach in favor of the "pro rata" approach. *See Consolidated Edison v. Allstate Ins. Co.*, 98 N.Y.2d 208, 224 (2002) ("Joint and several allocation in the present factual setting is inconsistent with the unambiguous language of the policies before us. . . . Pro rata allocation under these facts, while not explicitly mandated by the policies, is consistent with the language of the policies."). Maryland likewise follows the pro rata approach. *See Mayor & City Council of Baltimore v. Utica Mut. Ins. Co.*, 802 A.2d 1070, 1101 (2002) ("We hold that . . . the obligation to indemnify the insured under the circumstances on this case, which involves continuing asbestos product property damage, is to be prorated among all carriers based on their time on the risk.").

In addition to being the law of New York – whose courts would predict unsettled D.C. law to be similar to their own – and Maryland – whose courts the D.C. Court of Appeals often relies on – the "pro rata" approach has, in the Court's view, the simple advantage of being more persuasive. With respect to the D.C. Circuit, the "all sums" approach is not the "only logical resolution of this issue." *Keene*, 667 F.2d at 1050. To the contrary, the Court agrees with the New York Court of Appeals that pro rata allocation is more consistent with the policy language, in that the policies reflect an insurer's promise to pay all sums that the

20

insured is legally obligated to pay for property damage *that occurs during the policy period*. Moreover, the "all sums" approach creates perverse incentives. Often, an insured will choose to be uninsured (or self-insured) during the damage period. The "all sums" approach allows the insured to avoid the consequences of that choice. Here, for example, Amtrak's self-insured retention ("SIR") varied over the years between $1 million and $8 million. Under the "all sums" approach, Amtrak could – indeed, should – elect to assign all property damage to a year when its SIR was lowest, thus arbitrarily triggering coverage after only $1 million of damage instead of $8 million. *See Uniroyal*, 707 F. Supp. at 1392 ("Self-insurance is called 'going bare' for a reason.").

For these reasons, the Court holds that the D.C. Court of Appeals would follow the "pro rata" approach in this case. Ideally, of course, a jury would determine the amount of damage occurring in each year, and only those policies in effect for that year would cover that portion of the damage. Since, however, it is unlikely that such a precision allocation is possible, the Court will ask the jury to determine the total amount of covered damage and apportion that amount across triggered policies based on the time each policy was in effect, as a percentage of the total time over which covered damage occurred. *See Consolidated Edison*, 98 N.Y.2d at 225. Amtrak's SIRs will be included in the apportionment. *See Mayor*

*& City Council of Baltimore*, 802 A.2d at 1101-02 (apportioning share of coverage to "periods of self-insurance or no coverage").

## III.  (Partial) Conclusion

The Court must still address the remaining issues raised in the parties' motions for summary judgment, including the construction and effect of the "pollution exclusion" in certain policies and whether Amtrak gave timely notice of loss and complied with other procedural prerequisites to coverage.  In the meantime, the Court expects that the parties will use the holdings of this memorandum and order to effectively husband their resources in anticipation of trial.

**SO ORDERED.**

Frederic Block
Frederic Block
Senior United States District Judge

Brooklyn, New York
August 17, 2017