UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------x
CERTAIN UNDERWRITERS AT
LLOYD'S, LONDON; ACCIDENT &
CASUALTY CO.; ACCIDENT
& CASUALTY INSURANCE
COMPANY OF WINTERTHUR;
ACCIDENT & CASUALTY
INSURANCE COMPANY OF
WINTERTHUR (NO. 2A/C);
ACCIDENT & CASUALTY
INSURANCE COMPANY OF
WINTERTHUR (NO. 3 A/C);
AEGON NV FORMERLY AGO
SCHADEVEZEKERING
MAATSCHAPPIJ NV; AG DE 1830
COMPAGNIE BELGE
D'ASSURANCES GENERALES
INCENDIE ACCIDENTS ET
RISQUES DIVERS SA; AMERICAN
HOME INSURANCE COMPANY;
AMSTERDAM - LONDON
VERZEKERING MAATSCHAPPIJ
NV; ANCON INSURANCE
COMPANY (UK) LIMITED;
ARGONAUT NORTHWEST
INSURANCE COMPANY;
ASSICURAZIONI GENERALI SPA
(UK BRANCH); BISHOPSGATE
INSURANCE COMPANY LIMITED;
BRITAMCO POOL; CNA
REINSURANCE COMPANY; CNA
REINSURANCE COMPANY
LIMITED; CORNHILL INSURANCE
COMPANY LIMITED; CREDIT DE
NAMUR; DELTA-LLOYD NON-LIFE
INSURANCE COMPANY LIMITED;

**MEMORANDUM AND ORDER**
Case No. 14-CV-4717-FB-RLM

DELTA-LLOYD SCHADEVER-ZEKERING NV; DILIGENTIA; EUROPEESCHE VERZEKERING MAATSCHAPPIJ NV; EXCESS INSURANCE COMPANY LIMITED; GRESHAM FIRE & ACCIDENT INSURANCE SOCIETY LIMITED; GRESHAM INSURANCE SOCIETY LIMITED; HELVETIA-ACCIDENT SWISS INSURANCE COMPANY (AS PART OF GIBBON "E" GROUP); HARPER INSURANCE LTD F/K/A/ TUREGUM INS CO.; INSTITUTO DE REASSEGUROS DO BRASIL (IRG) - LONDON BRANCH; INTERLLOYD VERZEKERING MAASTSCHAPPIJ NV; KONING & BOEKE VAN 1819; LA BELGIQUE; L'ASSICURAZIONI D'ITALIA; LE ASSICURAZIONI D'ITALIA SPA; LES ASSURANCES GENERALES DE FRANCE; LES PROPRIETAIRES REUNIS S.A. D. ASSURANCES I.A.R.D.; L'ETOILE; LONDON & EDINBURGH GENERAL INSURANCE COMPANY, LONDON AND EDINBURGH GENERAL INSURANCE COMPANY LIMITED; MAAS LLOYD NV SCHADEVER-ZEKERINGSMAATSCHAPPIJ; MERCATOR ALGEMENE VER-ZEKERINGS MAATSCHAPPIJ NV; N.V. ROTTERDAMSE ASSURAN-TIEKAS, N.V. VERZ MIJ DE NOODERN; NAMUR ASSURANCES DU CREDIT; NATIONAL CASUALTY COMPANY; NATIONAL CASUALTY COMPANY OF AMERICA LIMITED;

NISSAN FIRE & MARINE INSURANCE COMPANY; NOORHOLLAND BRANDW; NORWICH UNION FIRE INSURANCE SOCIETY LIMITED; PROVIDENTIAL INSURANCE COMPANY; RHEINLAND VERSICHERUNGS AG; ROYAL NEDERLAND SCHADEVER-ZEKERING NV; ROYALE BELGE SA;  ROYALE BELGE INCENDIE REASSURANCE S.A.;  SIMCOE & ERIE GENERAL INSURANCE COMPANY; ST KATHERINE INSURANCE COMPANY PLC; TAISHO MARINE & FIRE INSURANCE COMPANY LIMITED; TERRA NOVA INSURANCE COMPANY; THE SUMITOMO MARINE AND FIRE INSURANCE COMPANY LIMITED; UNION AMERICA INSURANCE COMPANY LIMITED; WINTERTHUR SWISS INSURANCE COMPANY; WURTTEMBERGISCH FEUERVERSICHERRUNG AG; YASUDA FIRE & MARINE INSURANCE COMPANY (UK) LIMITED,

     Plaintiffs,

 -against-

NATIONAL RAILROAD PASSENGER CORPORATION; ALLIANZ INSURANCE COMPANY;

ALLSTATE INSURANCE COMPANY; AMERICAN HOME

ASSURANCE COMPANY; AMERICAN INSURANCE COMPANY; AMERICAN REINSURANCE COMPANY; ARGONAUT INSURANCE COMPANY; ASSUBEL ACCIDENTS ET DOMMAGES SA; ASTRA S.A. INSURANCE AND REINSURANCE COMPANY AS SUCCESSOR TO ADAS STATE INSURANCE INSTITUTE; ATLANTICA INSURANCE COMPANY; BANCO DE SEGUROS DEL ESTADO; BANDEIRANTE; BELLEFONTE INSURANCE COMPANY (US); BISON INSURANCE COMPANY LIMITED; BRITTANY INSURANCE COMPANY LIMITED; CALIFORNIA UNION INSURANCE COMPANY; CIGNA; COMPAGNIE BELGE D'ASSURANCES CREDIT S.A.; COMPANHIA DE SEGUROS IMPERIO; COMPANIA DE SEGUROS LA REPUBLICA S.A.; CONTINENTAL INSURANCE COMPANY AS SUCCESSOR IN INTEREST TO HARBOR INSURANCE COMPANY AND PACIFIC INSURANCE COMPANY; THE DOMINION INSURANCE COMPANY LIMITED; EURINCO ALLGEMEINE VERSICHERUNGS AKTIENGESELLSCHAFT; EVANSTON INSURANCE COMPANY; FIRST STATE INSURANCE COMPANY;

FIREMAN'S FUND INSURANCE COMPANY; GESB-GRUPO

EMPRESAS SEGURADORAS; GRANITE STATE INSURANCE COMPANY; THE HARTFORD ACCIDENT AND INDEMNITY COMPANY; HASSNEH INSURANCE COMPANY OF ISRAEL LIMITED; INSTITUTO NACIONALI DE REASEGUROS; INSURANCE COMPANY OF NORTH AMERICA; INSURANCE COMPANY OF THE STATE OF PENNSYLVANIA; INTERSTATE REINSURANCE CORPORATION; INTERNATIONAL SURPLUS LINES INSURANCE COMPANY; KOREAN REINSURANCE COMPANY; LANDMARK INSURANCE COMPANY; LEXINGTON INSURANCE COMPANY; NATIONAL MUTUAL INSURANCE COMPANY; NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PENNSYLVANIA; NORTHBROOK INSURANCE COMPANY; THE PEOPLE'S INSURANCE COMPANY OF CHINA; RAILROAD ASSOCIATION INSURANCE LIMITED; REAFIANZADORA Y REASEGURADORA DE AMERICA; ROBERTO FEVRE; SHAND MORAHAN & CO.; STRONGHOLD INSURANCE COMPANY LIMITED; VERA CRUZ INSURANCE COMPANY; WAUSAU INTERNATIONAL

UNDERWRITERS; YOSEMITE INSURANCE

COMPANY; and DOES 1-40,

                    Defendants.

-------------------------------------------------x

**BLOCK, Senior District Judge:**

This is a continuation of the Court's prior memorandum and order on the parties' motions for summary judgment. Since the LMI withdrew their claims of late notice and lack of consent during trial, the remaining issues to be addressed are (1) the scope of the so-called pollution exclusion and (2) the effect of payments by Penn Central's successor-in-interest, American Premier Underwriters ("APU"), on Amtrak's claims. In addition, this memorandum and order will address the letter motions of certain excess insurers that the claims against them should be dismissed for lack of a justiciable controversy.

**I. Pollution Exclusion**

Some—but not all—of the policies exclude coverage for damage resulting from pollution and similar occurrences. *See* Decl. of Cathy Rawlings (Feb. 13, 2017), Ex B at LMI_002367 ("seepage, pollution or contamination"), LMI_003980 ("discharge, dispersal, release or escape of . . . irritants, contaminants or pollutants"). Most, however, restore coverage in certain circumstances. In earlier policies, the exclusion does not apply if the pollution is caused by a "sudden, unintended and unexpected happening." *Id.*, Ex. B at LMI_002367. Later policies

provide coverage if the pollution is "sudden and accidental." *Id.*, Ex. B at 3980.  In one year's policies, the exclusion does not apply if the pollution is "accidental," regardless of whether is was "sudden."  *Id.*, Ex. B. at LMI_088614.  The parties dispute the meaning of both "sudden" and "accidental."

As a preliminary matter, the Court applies the presumption that D.C. law would be similar to New York law regarding the burden of proof on this issue.  Therefore, the insurers will have the burden of proving that pollution exclusion applies, while Amtrak will have the burden of proving that coverage is restored under the exception of the exclusion.  *See Northville Indus. Corp. v. National Union Fire Ins. Co.*, 89 N.Y.2d 621, 634 (1997) ("Shifting the burden to establish the exception conforms with an insured's general duty to establish coverage where it would otherwise not exist[.]").

**A. "Sudden"**

The LMI argue that "sudden" means abrupt.  Amtrak argues that "sudden" could mean either abrupt or unexpected, and that the ambiguity should be construed in favor of coverage.

There is, typically, no D.C. law squarely on point, but both Maryland and New York law support the LMI's interpretation.  In *American Motorists Insurance Co v. ARTRA Group, Inc.*, 659 A.2d 1295 (Md. 1995), the Maryland Court of Appeals contrasted a "sudden" discharge of hazardous waste with "gradual

7

pollution carried out on an ongoing basis during the course of business," *id*. at 1308, and approved the trial court's definition of "quick or instantaneous," *id*. at 1307. And in *Northville Industries*, the New York Court of Appeals rejected an interpretation similar to that favored by Amtrak because it would render "sudden" synonymous with "accidental":

> eliminating the temporal aspect from the meaning of sudden in the exception to the pollution coverage exclusion would render the sudden and accidental contingencies of the exception unavoidably redundant for unintended pollutant discharges. This redundancy is removed by including within the meaning of sudden in the pollution exclusion exception its temporal quality, as a discharge of the pollutant abruptly, precipitantly or brought about in a short time.

89 N.Y.2d at 632 (emphasis omitted). The Court agrees with the reasoning of these courts, and will give the jury a similar definition of "sudden."

B. "Accidental"

The parties generally agree that "accidental" means unintended, unexpected or fortuitous. *See ARTRA*, 659 A.2d at 1306; *Technicon Elecs. Corp. v. American Home Assurance Co.*, 74 N.Y.2d 66, 73 (1989) ("The waste discharges cannot be viewed as 'accidental' within the meaning of the exception to the pollution exclusion clause in this case where the gravamen of the underlying complaint . . . is that [the insured] knowingly discharged the pollutants into the waterway."). The LMI argue, however, that the contamination in this case was not accidental because it resulted from Amtrak's everyday operations.

8

The Court disagrees that normal business operations cannot, as a matter of law, cause accidental damage. To the contrary, such accidents are at the very heart of liability insurance. A company may intentionally transport cargo containers as part of its business operations, but it is still possible that one of its employees might unintentionally load a container in such a way that it falls and causes damage in transit.

What matters then, is whether the insured intended the action that gave rise to the liability for which it seeks indemnity. In *Technicon*, the tort lawsuit alleged that the insured "knowingly discharged the pollutants into the waterway." 74 N.Y.2d at 73. Similarly, in *Travelers Indemnity Co. v. Northrop Grumman Corp.*, 3 F. Supp. 3d 79 (S.D.N.Y. 2014), cited by the LMI, the insured stored contaminated wastewater in basins "designed to allow the wastewater to infiltrate back into the ground and return it to groundwater." *Id*. at 85.

By contrast, the Court reads the record in this case to suggest that the contamination at Sunnyside Yard came from inadvertent spills during fueling and storage operations, not an intentional release of hazardous waste. If the jury drew that inference, it could easily conclude that the contamination was "accidental."

## II. Payments by APU

In 2007, Amtrak sued APU for Penn Central's alleged role in the contamination at Sunnyside Yard. APU paid Amtrak $8.6 in settlement of that

9

suit. Prior to the suit, it had paid Amtrak $722,000, ostensibly as reimbursement for cleanup costs borne by Amtrak.

The LMI argues that those payments must be deducted from Amtrak's claimed losses under the policies. In support, it cites the policies' reference to "Ultimate Net Loss," which is defined to include "deductions for all recoveries, all salvages and all collectible claims upon other insurances." Rawlings Decl., Ex. B at LMI_02384-85. As explained in the prior memorandum and order, however, the LMI promised to pay Amtrak's ultimate net loss *in addition* to any sums that Amtrak was legally obligated to pay as compensation for specified types of damage.

Nevertheless, it is a basic principle of equity that a plaintiff should not recover twice for the same loss, and courts have applied that principle to prevent those seeking indemnity from obtaining a windfall as a result of payments from others potentially liable for the cleanup. *See Lockheed Martin Corp. v. United States*, 35 F. Supp. 3d 92, 154-55 (D.D.C. 2014). It does not follow, however, that the jury must be burdened with an additional wrinkle to determining Amtrak's claims for coverage. Rather, since the issue is an equitable one, the Court concludes that APU's payments are more analogous to a post-verdict, collateral-source offset under New York law. *See* N.Y. C.P.L.R. § 4545(a) ("Any collateral source deduction required by this subdivision shall be made by the trial court after

the rendering of the jury's verdict.").

This is not to say that the LMI are entitled to the offset as a matter of law. Amtrak argues that there is no windfall because APU is an additional insured under the policies, such that the LMI are obligated to indemnify both entities for their cleanup liability. In addition, there may be a genuine dispute is to whether APU's payments correspond to losses for which Amtrak seeks coverage. *See Oden v. Chemung Cnty. Indus. Dev. Agency*, 87 N.Y.2d 81, 83 (1995) (offset proper only when "collateral source payment represents reimbursement for a particular category of loss that corresponds to a category of loss for which damages were awarded"). These matters—and any others the parties wish to raise—can be addressed by the Court after the verdict.

## III. Excess Liability

In the prior memorandum and order, the Court held that the jury would determine when, if ever, the injurious process giving rise to Amtrak's claims for coverage began, and that the total liability, if any, on those claims would be apportioned pro rata across all subsequent policy years. Based on those rulings, four excess carriers—Yosemite Insurance Company, Allstate Insurance Company, The Continental Insurance Company, and Eurinco Allgemeine Versicherungs Aktiengesellschaft—argue that Amtrak's losses cannot plausibly reach their layers of coverage.

11

Amtrak claims that its losses to date at Sunnyside Yard total around $26.7 million and argues that the loss is covered by policies in effect over a span of fourteen years. If the jury agrees, the apportioned loss will be less than $2 million per year. By contrast, the excess policies at issue have underlying limits of coverage of between $10 million and $60 million.

Agreeing that there is no reasonable prospect that Amtrak's damages would reach the necessary limits, the Court granted the excess carriers' motion and dismissed Amtrak's breach of contract claims against them. Dismissing the claims for declaratory relief, however, means that the excess carries would not be bound by the resulting judgment should the jury find that Amtrak's cleanup costs were otherwise covered.

Meanwhile, Amtrak has represented that it continues to incur cleanup costs at Sunnyside Yard. Though its current estimate of future costs is only around $2 million, they may increase to a point likely to trigger the excess policies. In addition, the Second Circuit may reverse the Court's ruling on allocation and agree with Amtrak that the "all sums" approach governs. If one or both of those contingencies were to occur after the excess carriers had been dismissed, Amtrak would have to relitigate the coverage issues now being tried, possibly with inconsistent results. That result is far worse than the expense and inconvenience of remaining in the case, particularly since the trial is fast reaching a conclusion.

## IV. Conclusion

For the reasons stated in this and the prior memorandum of law, the LMI's motion for summary judgment and Amtrak's motion for partial summary judgment are both denied. The excess insurers' motion for summary judgment is granted with respect to Amtrak's breach of contract claims, but otherwise denied.

**SO ORDERED.**

/S/ Frederic Block
Frederic Block
Senior United States District Judge

Brooklyn, New York
September 21, 2017